USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/11/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X

AFTERN SANDERSON,

                                Plaintiff,

                    -v -

LEG APPAREL LLC, AMIEE LYNN
ACCESSORIES, INC., STEVEN H.
SPOLANSKY, MELISSA ROMANINO, and
STUART DIAMOND,

                           Defendants.

--------------------------------------------------------------- X

                              1:19-cv-08423-GHW

                         <u>MEMORANDUM OPINION</u>
                           <u>AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

       Plaintiff Aftern Sanderson worked for Defendants Leg Apparel and its subsidiary Amiee Lynn. Sanderson is Black. He alleges that he was assigned a disproportionately heavy workload relative to his white colleagues. Sanderson also complained to Human Resources when Defendant Melissa Romanino asked him in front of their colleagues whether his contact at a client was his "boyfriend." Two days later, Sanderson was fired.

       Sanderson alleges that Defendants discriminated against him based on his race and perceived sexual orientation. Defendants moved to dismiss some of Sanderson's claims. Because Sanderson has plausibly alleged a *prima facie* case of race and sexual orientation discrimination, Defendants' partial motion to dismiss is mostly DENIED. But Sanderson's negligent infliction of emotional distress and gender-based hostile work environment claims are inadequately pleaded, so Defendants' motion to dismiss is GRANTED in part.

## I. BACKGROUND

### A. Facts[1]

Leg Apparel is a hosiery design, manufacturer, and marketer in New York.  AC ¶ 3.  Leg Apparel is a subsidiary of Amiee Lynn.  *Id.*  Sanderson worked for Leg Apparel and Amiee Lynn as a senior planner for about two years and eight months.  *Id.* ¶ 7.  Romanino was Sanderson's supervisor.  *Id.* ¶ 32.  Sanderson alleges that his work was "stellar."  *Id.* ¶ 10.  Sanderson allegedly received annual salary increases and was never "written up" for his behavior.  *Id.* ¶ 11.  Sanderson alleges that Romanino praised him effusively.  *Id.* ¶ 12.

#### 1. Alleged Race Discrimination

Sanderson alleges that his colleagues discriminated against him because he is Black.  Sanderson's white colleagues allegedly made four disparaging comments about African Americans.  *Id.* ¶ 13.  He first alleges that Anthony Principe, a white colleague, compared Nicki Minaj (who is African American) to Taylor Swift (who is white).  *Id.* ¶ 14.  Principe allegedly commented that Minaj should "stay in her lane," that she did not deserve to be nominated for the 2015 MTV awards, and that Swift is a superior artist.  *Id.*  Sanderson alleges that Principe made these comments to provoke a "racially charged confrontation" and that he "looked directly" at Sanderson after making them.  *Id.*  And Principe's tone allegedly conveyed "extreme animosity."  *Id.*  Principe also allegedly disparaged Don Lemon (who is African American) around Sanderson and other Leg Apparel employees.  *Id.* ¶ 15.  Sanderson alleges that Principe commented that Lemon is unqualified and unintelligent.  *Id.*  Again, Principe allegedly looked directly at Sanderson after he made these comments as if he expected a response.  *Id.*

---

[1] The facts in this section are drawn from Sanderson's amended complaint ("AC"), Dkt No. 48, and his opposition ("Opp.") to Defendants' partial motion to dismiss, Dkt No. 69.  For this motion, the Court must accept as true the facts alleged in the amended complaint.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  Because Sanderson is *pro se*, the Court also considers factual allegations in his opposition.  *See, e.g., Braxton v. Nichols*, No. 08 Civ. 8568(PGG), 2010 WL 1010001, at *1 (S.D.N.Y. Mar. 18, 2010).  But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Sanderson next alleges that Kayla Coppola, another white coworker of his, also made racially insensitive remarks. *Id.* ¶ 17. During protests in Baltimore in April 2015—which Sanderson characterizes as "African American protests"—Coppola asked: "What are they . . . complaining about?" *Id.* Sanderson understood her to be referring to African Americans when she made this statement. *Id.* And finally, after Rachel Dolezal, a "former NAACP leader in San Francisco who claimed to be black," was "'outed' . . . as white[,]" Coppola allegedly asked: "Who would pretend to be Black?" *Id.* ¶ 18. Sanderson alleges that Principe's and Coppola's remarks deeply offended him. *Id.* ¶ 19.

In August 2016, Sanderson allegedly had a "formal discussion" with the former head of Human Resources ("HR"), Nelly Perrone. *Id.* ¶ 20. Sanderson expressed concern that Coppola was not performing her share of work. *Id.* Sanderson also complained that staff meetings led by Romanino included excessive gossip about personal matters. *Id.* Sanderson also alleges that he carried a heavier workload than his white colleagues. *Id.* ¶ 21. The wasted time at staff meetings led by Romanino allegedly compounded this problem. *Id.*

In the fall of 2017, Sanderson alleges that he complained to Perrone that Romanino and her supervisor, Arthur Lavitt, "bull[ied]" him and made "veiled threats" about his job. *Id.* ¶ 22. Romanino and Lavitt allegedly created unnecessary work for Sanderson and left resumes for potential candidates to replace him where passersby could see them. *Id.* Sanderson then spoke about his workload with Michael Spolansky.[2] *Id.* ¶ 23. Sanderson told Spolansky that Lavitt once "forced" him to stay at work until 10:30 p.m. *Id.* Spolansky allegedly responded that there was to be "no more working until 10:30 p.m[.]" *Id.* Spolansky also told Sanderson that only Romanino, and not Lavitt, would supervise him. *Id.*

---

[2] Michael Spolansky is not to be confused with named Defendant Stephen Spolansky. Sanderson alleges that Michael Spolansky is the president of Amiee Lynn and Stephen Spolansky is the president of Leg Apparel.

Sanderson alleges that his white coworkers intentionally talked loudly and argued among themselves near him. *Id.* ¶ 24. They allegedly did this to make it difficult for Sanderson to converse on the phone with his client, Walmart. *Id.* Sanderson alleges that his colleagues did not talk loudly and argue when his white colleagues were on conference calls "at the same workstation." *Id.* Sanderson's white colleagues allegedly intended to disrupt his phone calls to discriminate against him because of his race. *Id.*

### 2. Alleged Sexual Orientation Discrimination

Sanderson also alleges that Defendants discriminated against him because of his perceived sexual orientation. He alleges that Leg Apparel hired Victor Doggett in August 2016. *Id.* ¶ 25. Sanderson trained Doggett, who is also African American. *Id.* Shortly after he started, Doggett allegedly recounted a conversation he witnessed during his interview. *Id.* ¶ 26. Lavitt, Romanino, and Coppola were interviewing Doggett. *Id.* Lavitt asked Romanino: "Where is Aftern? He should meet Victor[.]" *Id.* Romanino responded that Sanderson was "in Martha's Vineyard[.]" *Id.* Lavitt asked: "Who's he with?" *Id.* Coppola interjected that Sanderson was "with his boyfriend[.]" *Id.* Romanino responded that Coppola didn't "know that." *Id.* Sanderson alleges that Coppola responded cryptically, "I know." *Id.* Sanderson alleges that Doggett told him that after this exchange, "humorous banter ensued" among the three interviewers. *Id.* ¶ 27. Sanderson was the target of this allegedly vicious "banter." *Id.* Sanderson also disputes that he was "with his boyfriend" on Martha's Vineyard. *Id.* ¶ 28.

While Doggett was employed at Leg Apparel, Sanderson allegedly witnessed other Leg Apparel employees joking about Doggett's perceived sexual orientation. *Id.* ¶ 31. Doggett allegedly told his colleagues that "in a previous life[,]" Doggett believed he "was a French woman with long flowing hair." *Id.* Sanderson's colleagues apparently inferred from this that Doggett was not heterosexual and joked about his sexual orientation. Sanderson alleges that he found his colleagues'

speculation about Doggett's sexual orientation "disrespectful, unprofessional[,] and discriminatory."
*Id.*

Leg Apparel fired Doggett in early 2017.  *Id.* ¶ 31.  Romanino allegedly told Sanderson that
Doggett was fired because he commented to Romanino that her daughter appeared "malnourished."
*Id.* ¶ 30.  But Perrone told Doggett that Leg Apparel was terminating him because of "budget cuts."
*Id.*

In July 2017, Sanderson alleges that Romanino again derisively referred to his sexual
orientation.  Sanderson allegedly reported to Romanino that a conference call with a contact at
Walmart went well.  *Id.* ¶ 32.  Romanino asked in response whether the client contact at Walmart
was Sanderson's "boyfriend."  *Id.*  Romanino then allegedly laughed with a different Leg Apparel
employee, Angela Gillian.  *Id.*  Sanderson alleges that Romanino made this remark in front of their
colleagues and that Sanderson was thus "humiliated" by the remark.  *Id.*  But Sanderson did not
report the incident to HR because he worried that Leg Apparel management would retaliate against
him.  *Id.*  Sanderson alleges that management has fired other employees who have filed complaints
to retaliate against them.  *Id.*

Sanderson alleges that a similar incident occurred on September 7, 2017.  *Id.* ¶ 33.
Sanderson again allegedly reported to Romanino that a conference call with a different client contact
at Walmart had gone well.  *Id.*  Romanino again asked whether Sanderson's client contact at Walmart
was his "boyfriend."  *Id.*  Again, Romanino asked this question in front of other Leg Apparel
employees.  *Id.*  And again, Sanderson was humiliated.  *Id.*  Sanderson alleges that Romanino "never
asked white or heterosexual colleagues" if their clients were their same-sex partners.  *Id.*  So
Sanderson argues that Romanino subjected him to disparate treatment.  *Id.*

### 3. Sanderson's Internal Complaints and Termination

Four days later, Sanderson emailed Romanino and Jennifer Borrelli, the Manager of HR, to

complain.  *Id.* ¶ 36; *see also* Ex. L to AC.  In the email, Sanderson described the July and September

2017 incidents.  AC ¶ 36.  In response, Romanino "apologized for 'any hurt' she may have caused."

Ex. L to AC.  Sanderson alleges that he told Borelli that he "just wanted the sexist jokes to stop"

because the jokes embarrassed him.  AC ¶ 37.  Borrelli allegedly apologized to him on behalf of Leg

Apparel and said that harassment would "not be tolerated."  *Id.* ¶ 38.  Sanderson doubted Borrelli's

sincerity because Leg Apparel allegedly settled seven sexual harassment complaints against Leg

Apparel President Stephen Spolansky.  *Id.* ¶ 39.  Sanderson also alleges that Leg Apparel fired a

former employee who complained that Lavitt sexually harassed her.  *Id.*  Sanderson alleges that these

incidents were "widely known and discussed" in the office.  *Id.*  Sanderson alleges that, in his

opinion, Leg Apparel and Amiee Lynn were a "good Ole Jewish boys club" that protected its senior

management team.  *Id.*

　　　　Sanderson also alleges that he expressed other concerns to Borrelli.  *Id.* ¶ 40.  Sanderson

complained that he had a disproportionate workload and that his white colleagues seemed to have

very little work.  *Id.*  For example, Sanderson alleges that he observed a white colleague, "Mr. Ford,"

reading articles on his computer rather than doing his work.  *Id.*  Romanino and Lavitt allegedly

treated Ford better than Sanderson because he is white.  *Id.* ¶¶ 41-42.  Sanderson alleges that Ford

travelled with Lavitt to meet with "[Sanderson's] departments" at Wal-Mart headquarters in

Bentonville, Arkansas.  *Id.* ¶ 43.  Sanderson interpreted this as Lavitt "groom[ing]" Ford for the lead

planner position with his departments.  *Id.*  Although Sanderson concedes that Ford was "a talented

[junior] planner," he also alleges that he had not worked with Walmart directly.  *Id.*  Indeed,

Sanderson alleges that Ford took "several training courses about Walmart planning" when he arrived

at Leg Apparel.  *Id.*  In contrast, Sanderson had over eight years of experience working with

Walmart.  *Id.*  Yet despite his relative lack of experience, Sanderson alleges that management wanted

to push Ford for a leadership role on the Walmart account.  *Id.*  Sanderson alleges that he relayed

these concerns to Borrelli.  *Id.* ¶ 40.

On September 13, 2017—just two days later—Sanderson called in sick to work.  *Id.* ¶ 45. He alleges that he was "unable to work" because he was "emotionally distressed[.]"  *Id.*  That was because co-workers allegedly spoke to him "abrasive[ly]" after they learned about his email to Romanino.  *Id.*  Although he called in sick, Romanino allegedly assigned Sanderson a "Spring 2018 Initial Set Project" with a deadline of September 15, 2017.  *Id.* ¶ 46.  So on September 13, Sanderson worked from home.  *Id.* ¶ 47.  When he finished part of his assigned project, Sanderson emailed the finished product to Romanino and Ford at 2:45 p.m.  *Id.*  But his email did not go through because he could no longer connect to the company server.  *Id.*

Ten minutes later, Sanderson received a call from Borelli and Defendant Stuart Diamond, the CFO of Leg Apparel and Amiee Lynn.  *Id.* ¶ 48.  Diamond allegedly told Sanderson that he was terminated because it was "in the best interest of the company."  *Id.*

Two days after he was terminated, Sanderson filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC").  *Id.* ¶ 49; *see also* Ex. C to AC.  Sanderson alleges that Diamond admitted that the company retaliated against him for complaining about discrimination.  AC ¶ 50.  Ten days later, Sanderson sent a "Formal Grievance" letter to Leg Apparel.  *Id.* ¶ 51; *see also* Ex. E to AC.

About two weeks after he was terminated, Sanderson filed a charge with the New York State Division of Human Rights ("NYSDHR").  AC ¶ 65; *see also* Ex. F to AC.  In March 2018, the NYSDHR determined that there was probable cause to believe that Leg Apparel and Amiee Lynn had discriminated against Sanderson because of his race and perceived sexual orientation.  AC ¶ 69; *see also* Ex. K to AC.  But the EEOC declined to pursue the charge because of a "work sharing agreement" between the EEOC and the NYSDHR.  Ex. M to AC.  The EEOC's letter also noted that Sanderson "preserve[d] [his] right to request a Notice of Right to Sue from the EEOC" after

the complaint was pending with the NYSDHR for 180 days. *Id.*

In May 2019, Sanderson requested an administrative closure from the NYSDHR so that he could sue in federal district court. AC ¶ 73; *see also* Ex. O to AC. That request was granted and the NYSDHR issued an Administrative Convenience Dismissal of the NYSDHR investigation. AC ¶ 74; *see also* Ex. Q to AC. In August 2019, Sanderson received a Right to Sue letter from the EEOC. AC ¶ 77; *see also* Ex. S to AC.

### B. Procedural History

Sanderson began this case in September 2019. Dkt No. 1. He amended his complaint in January 2020. Dkt No. 48. The amended complaint asserts fourteen claims for relief. AC ¶¶ 85-160. Counts one, three, five, and eight assert claims for race and gender discrimination under 42 U.S.C. § 1981,[3] Title VII, the New York State Human Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL"). AC ¶¶ 85-90, 95-101, 106-12, 122-28. Counts two, four, six, and nine assert claims for retaliation under section 1981, Title VII, the NYSHRL, and the NYCHRL. *Id.* ¶¶ 91-94, 102-105, 113-16, 129-32. Counts seven and ten allege that Spolansky, Romanino, and Diamond aided and abetted violations of the NYSHRL and the NYCHRL. *Id.* ¶¶ 117-21, 133-37. Counts eleven, twelve, thirteen, and fourteen assert claims for hostile work environment race and gender discrimination under Title VII, section 1981, the NYSHRL, and the NYCHRL. *Id.* ¶¶ 138-60. In his opposition, Sanderson clarified that in his amended complaint, he intended to allege a claim for negligent infliction of emotional distress under New York law. Opp. at 21-23. And although Sanderson did not formally assert a cause of action for negligent infliction of emotional distress, his amended complaint repeatedly alleges that Defendants caused him

---

[3] Sanderson's opposition notes that he did not intend to allege gender or sex discrimination under section 1981. Opp. at 15. In any event, "[s]ection 1981 solely prohibits discrimination on the basis of race and does not apply to gender, religion, national origin, or age discrimination." *Mazurkiewicz v. New York City Health & Hosps. Corp.*, No. 09 CIV 5962(WHP), 2010 WL 3958852, at *4 (S.D.N.Y. Sept. 16, 2010) (citing *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998)).

emotional distress.  *See, e.g.*, AC ¶¶ 95, 97, 108.  Because Sanderson is *pro se*, the Court construes the amended complaint as raising a claim for negligent infliction of emotional distress.

Defendants moved to dismiss Sanderson's discrimination, hostile work environment, aiding and abetting, and negligent infliction of emotional distress claims; Defendants did not move to dismiss Sanderson's retaliation claims.  Dkt Nos. 62-63.  Sanderson opposed the motion, Dkt No. 69, and Defendants replied, Dkt No. 71.  Sanderson then filed a letter that the Court construed as a sur-reply, Dkt No. 72, and Defendants responded to Sanderson's sur-reply, Dkt No. 74.

## II. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  If a complaint fails to meet this pleading standard, a defendant may move to dismiss it for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679 (citation omitted).  A court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124

(2d Cir. 2008) (per curiam).  But a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

Sanderson is *pro se*, so the Court must construe the amended complaint "liberally to raise the strongest arguments it suggests."  *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed[.]'") (quotation omitted).  Courts must afford *pro se* plaintiffs "special solicitude" before granting motions to dismiss.  *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994).  Even so, "dismissal of a *pro se* complaint is . . . appropriate where a plaintiff has clearly failed to meet minimum pleading requirements."  *Rahman v. Schriro*, 22 F. Supp. 3d 305, 310 (S.D.N.Y. 2014) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997)).

On a motion to dismiss, a court may ordinarily "consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies."  *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013).  But "allegations made in a *pro se* plaintiff's memorandum of law, where they are consistent with those in the complaint, may also be considered on a motion to dismiss."  *Braxton*, 2010 WL 1010001, at *1; *see also Rosado v. Herard*, No. 12 Civ. 8943(PGG)(FM), 2013 WL 6170631, at *3 (S.D.N.Y. Nov. 25, 2013) (citation omitted).  The Court has thus considered the factual allegations in Sanderson's opposition.

## III. DISCUSSION

### A. Race Discrimination Claims

Sanderson has plausibly alleged claims for racial discrimination under federal, state, and local law.  Title VII prohibits an employer from discriminating in "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex or national origin."

42 U.S.C. § 2000e-2(a)(l).  Section 1981 also prohibits employment discrimination by private employers.  *See id.* § 1981.[4]  The NYSHRL likewise prohibits employers from discriminating based on race, color, sex, gender, and sexual orientation.  *See* N.Y. Exec. Law § 296.  And the NYCHRL prohibits employers from discriminating "because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service or alienage or citizenship status of any person[.]"  N.Y.C. Admin. Code § 8-107(1)(a).

Defendants raise as a threshold argument that the Court should not consider Sanderson's race discrimination claims because he did not raise those claims before the EEOC or the NYSDHR. A plaintiff alleging a federal employment discrimination claim "must exhaust administrative remedies through the EEOC" or an analogous state agency such as the NYSDHR.  *Soules v. Connecticut, Dep't of Emergency Servs. & Pub. Prot.*, 882 F.3d 52, 57 (2d Cir. 2018) (citations omitted).

Sanderson meets the exhaustion requirement.  True, neither Sanderson's initial EEOC or NYSDHR complaints alleged race discrimination.  *See* Ex. C and F to AC.  But the NYSDHR issued a probable cause determination in March 2018 that "[t]he Division's investigation has uncovered evidence supporting an inference of employment discrimination based on [Sanderson's] perceived sexual orientation *and race*[.]"  Ex. K to AC at 4 (emphasis added).  So it is disingenuous for Defendants to suggest that the EEOC or the NYSDHR "cannot reasonably have been expected to investigate whether he experienced a hostile work environment based on race."  Memorandum of Law in Support of Motion to Dismiss ("Mem."), Dkt No. 63, at 6 n.2.  The NYSDHR *did* investigate whether Defendants racially discriminated against Sanderson.  The exhaustion

---

[4] *See id.* § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]"); *see also Patterson v. Cty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004) ("[Section 1981] outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment.").

requirement does not bar Sanderson's race discrimination claim.

Sanderson has plausibly alleged a *prima facie* case of race discrimination under federal law.  To state a *prima facie* case of discrimination under Title VII and section 1981, a plaintiff must allege "(1) that she is a member of a protected class, (2) that she was qualified for the position . . . , (3) that she suffered an adverse employment action, and (4) [that she] can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation."  *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015).

Sanderson has met this pleading burden.  Sanderson has alleged that he is Black and that he was qualified for his position.  He has also alleged that he was assigned a disproportionately heavy workload relative to his white colleagues, which is an adverse employment action.  *See Feingold v. New York*, 366 F.3d 138, 152-53 (2d Cir. 2004) ("Feingold's allegations, if true, would show that he experienced two adverse employment actions:  the assignment of a disproportionately heavy workload, and termination.").  Granted, "allegations of excessive work" do not necessarily qualify as an "adverse employment action[.]"  *Fridia v. Henderson*, No. 99 CIV. 10749 BSJ, 2000 WL 1772779, at *7 (S.D.N.Y. Nov. 30, 2000) (citation omitted).  But Sanderson alleges that his workload was heavier than similarly situated white colleagues.  *Feingold* held that allegations of a disproportionate workload can qualify as an adverse employment action.  *Feingold*, 366 F.3d at 152-53. And because Sanderson alleges that his white colleagues were assigned less work, Sanderson has met his minimal burden to allege facts suggesting an inference of discriminatory motivation.[5]

Defendants argue that Sanderson's allegation of disproportionate workload does not support an inference of discrimination.  *See* Mem. at 9 (citing *Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534,

---

[5] Sanderson also alleges that his white coworkers made racially insensitive remarks to provoke a confrontation with him. AC ¶¶ 14-15, 17-18.  Defendants dismiss these comments as insignificant.  *See* Mem. at 8-9.  These comments, in themselves, may have been inadequate to support even a minimal inference of discriminatory treatment.  But Sanderson's allegation that he was assigned a disproportionate workload is adequate to support such an inference, so the Court need not rely on those comments alone to conclude that Sanderson has pleaded a *prima facie* case of race discrimination.

545 (E.D.N.Y. 2003); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 255 (E.D.N.Y. 2012)).  That

argument is unavailing.  Both *Hunter* and *Sotomayor* are inapposite because they were decided at

summary judgment.  And more importantly, the Second Circuit held in *Feingold* that an employee's

allegation that he was assigned a "disproportionately heavy workload" supported a plausible

inference of discrimination.  *Feingold*, 366 F.3d at 153 ("If a trier-of-fact credited" the allegations that

a white employee faced a "disproportionately heavy workload" relative to African-American

employees, "it could conclude that Feingold was subjected to disparate treatment under

circumstances giving rise to an inference of racial discrimination.").  So Sanderson's allegations that

he was assigned more work than Ford—a white colleague with similar job responsibilities—are

adequate to survive Defendants' motion to dismiss.[6]

     Sanderson has also adequately pleaded a claim for race discrimination under the NYSHRL.

Employment discrimination claims under the NYSHRL are subject to the same standards as claims

under Title VII and section 1981.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.l (2d Cir. 2000).

Sanderson has plausibly alleged claims under Title VII and section 1981, so he has also plausibly

alleged a claim under the NYSHRL.

     And Sanderson has plausibly alleged a claim for race discrimination under the NYCHRL.

---

[6] In their reply papers, Defendants note that Sanderson's opposition states that he is not arguing that he was terminated because of his race.  *See* Reply Memorandum in Support of Motion To Dismiss (Rep.), Dkt No. 71, at 5 (citing Opp. at 11).  Defendants argue that this concession "obliterates" Sanderson's ability to make a *prima facie* showing of race discrimination.  *Id.*  Overheated rhetoric aside, Defendants ignore, either willfully or negligently, that allegations of a disproportionate workload can qualify as an adverse employment action.  Indeed, Defendants did not cite *Feingold* in their briefing, instead citing inapposite cases and making the dubious argument that "additional workload" does not qualify as an adverse employment action.  Rep. at 6. (citation omitted).  That argument slides perilously close to "misleading" territory.  As noted above, it is true that allegations of a heavy workload do not themselves support an inference of discrimination.  But the Second Circuit could not have been clearer in *Feingold* that allegations that an employee was assigned a disproportionate workload because of his race—which is precisely what Sanderson has alleged in this case—are adequate to support an inference of discrimination.  Counsel for Defendants is reminded that it has "an ethical obligation to 'disclose to the tribunal controlling legal authority known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel.'"  *Vill. of Freeport v. Barrella*, 814 F.3d 594, 609 n.60 (2d Cir. 2016) (quoting N.Y. Rules of Prof'l Conduct 3.3(a)(2)); *see also United States v. Gaines*, 295 F.3d 293, 302 (2d Cir. 2002) (observing that "failure to cite controlling authority 'is at best inexcusably poor lawyering and at worst suggests counsel's ignorance or violation of'" the rules of professional conduct).  Breach of that duty can result in sanctions.

Although NYCHRL claims had for many years "been treated as coextensive with state and federal counterparts," the New York City Council, in passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), "rejected such equivalence" in favor of a broader remedial scope. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). The Restoration Act established two new rules of construction for the NYCHRL: (1) "a 'one-way ratchet,' by which interpretations of state and federal civil rights statutes can serve only 'as a *floor* below which the City's Human Rights law cannot fall'"; and (2) a requirement that the NYCHRL provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting Restoration Act §§ 1, 7). The Second Circuit has clarified that these amendments to the Restoration Act require courts to analyze NYCHRL claims "separately and independently from any federal and state law claims." *Id.* The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Id.* (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78 (2011)). Sanderson has plausibly alleged disparate treatment claims under federal and state law and these laws serve as a floor below which NYCHRL claims cannot fall, so he has plausibly alleged an NYCHRL race discrimination claim.

Sanderson's claims for hostile work environment racial discrimination survive for much the same reason.[7] To state a claim for a hostile work environment under federal law, a plaintiff must

---

[7] Sanderson pleaded his "adverse employment action" and "hostile work environment" theories as separate causes of action, so the Court analyzes them separately. But these are two ways of proving a claim for disparate treatment. *See, e.g.*, *Feingold*, 366 F.3d at 149 ("A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment."). There may thus be little, if any, practical difference if Sanderson proceeds on only an "adverse employment action" theory or both "adverse employment action" and "hostile work environment" theories.

"plead facts that would tend to show that the complained of conduct:  (1) 'is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's [protected characteristic].'"  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citation omitted).

 "Whether the challenged conduct is sufficiently severe or pervasive depends on the totality of the circumstances."  *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (quotation omitted).  "The Supreme Court in [*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)] 'established a non-exclusive list of factors' to consider in this regard:  '(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere "offensive utterance"; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted.'"  *Id.* (citations omitted). "Ultimately, to avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, and [the Second Circuit has] repeatedly cautioned against setting the bar too high in this context."  *Patane*, 508 F.3d at 113.

 Sanderson's allegations are adequate to plead that he was subjected to objectively severe or pervasive conduct.  Most importantly, Sanderson has alleged that he was assigned a disproportionate workload because of his race.  "[A]llegations of a heavier workload alone can[] support a viable hostile work environment claim" if the "plaintiff was subjected to 'disproportionately burdensome work assignments.'"  *Wilson v. Family Dollar Stores of New York, Inc.*, No. CIV A CV-06-639 (DGT), 2008 WL 4426957, at *8 (E.D.N.Y. Sept. 25, 2008) (quoting *Garone v. UPS*, 436 F. Supp. 2d 448, 467 (E.D.N.Y. 2006)), *aff'd*, 374 F. App'x 156 (2d Cir. 2010); *see also Raniola v. Bratton*, 243 F.3d 610, 621

(2d Cir. 2001).  A reasonable employee could find that the assignment of a disproportionate workload altered her employment conditions "for the worse."  *Patane*, 508 F.3d at 113.

Sanderson also alleges that his white colleagues made four racially insensitive remarks and that his white colleagues received praise for their work and Sanderson did not.  And Sanderson alleges that his white colleagues talked loudly while he was on the phone with clients but did not do so when white employees were on the phone.  Standing alone, these allegations might fail to plead that a plaintiff was subjected to an objectively hostile work environment.  But together with the allegations that he was assigned a disproportionately heavy workload, Sanderson has pleaded that he faced an objectively hostile work environment.

Sanderson has also plausibly alleged that he subjectively perceived his environment as hostile.  Sanderson's amended complaint teems with allegations that his colleagues' racially insensitive actions distressed him emotionally.  And Sanderson has adequately pleaded that he faced a hostile work environment because of his race.  So Sanderson has plausibly alleged a hostile work environment claim.[8]

### B. Sex Discrimination Claims

Sanderson has plausibly alleged a claim for sex discrimination.  The standard for a plaintiff to allege a *prima facie* case of gender discrimination is the same as for a claim for race discrimination.  To reiterate, a plaintiff must allege "(1) that she is a member of a protected class, (2) that she was qualified for the position . . . (3) that she suffered an adverse employment action, and (4) [that she] can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311.

Sanderson has adequately alleged that he is a member of a protected class under federal law.

---

[8] The standard for a hostile work environment claim under the NYSHRL is the same as under Title VII and section 1981.  *See Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013).  And Sanderson's NYCHRL hostile work environment claim also survives because the NYCHRL is a one-way ratchet.

Sanderson alleges that Defendants discriminated against him based on his perceived sexual orientation.  The Second Circuit has held that "sexual orientation discrimination is a form of sex discrimination" under Title VII.  *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 131-32 (2d Cir. 2018) (en banc).[9]  And under state and city law, it is unlawful for employers to discriminate based on sexual orientation.  *See* N.Y. Exec. Law § 296; N.Y.C. Admin. Code § 8-107(1)(a).

Defendants argue that because Sanderson has not alleged that he is not heterosexual, he cannot bring a sex discrimination claim.  That argument is unpersuasive.  Courts in this District have interpreted *Zarda* to apply to claims based on perceived sexual orientation.  *See, e.g., Jamiel v. Maison Kayser@USA.com*, No. 19-CV-1389 (GBD), 2019 U.S. Dist. LEXIS 90700, at *8 n.3 (S.D.N.Y. May 22, 2019) ("The Second Circuit has recognized employment discrimination claims based on perceived sexual orientation as 'a subset of sex discrimination' barred by Title VII." (quoting *Zarda*, 883 F.3d at 112, 131)); *Johnson v. City of New York*, No. 18-CV-9600 (AJN), 2020 WL 2036708, at *4 (S.D.N.Y. Apr. 28, 2020) ("Plaintiff has therefore provided at least minimal support to raise an inference of discrimination on the basis of perceived sexual orientation.").  That makes sense, not least because the *Zarda* plurality grounded its opinion in the notion that sexual orientation discrimination is a form of sex stereotyping.[10]  883 F.3d at 119-23.  And more importantly, Defendants have not offered a reason to distinguish between actual and perceived sexual orientation.  *Cf. Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 371 n.9 (7th Cir. 2017) (Sykes, J., dissenting) (arguing that "the law should not distinguish between claims of discrimination for 'acting gay' and claims of discrimination for 'being gay'").  The Court sees no reason for this distinction.  So the mere fact that Sanderson has not alleged that he is not heterosexual does not compel dismissal

---

[9] The Supreme Court granted certiorari in *Zarda* and the case is pending before the Supreme Court.
[10] Only six of the thirteen en banc judges joined the portion of the opinion in *Zarda* describing sexual orientation discrimination as a form of sex stereotyping.

of his claims.[11]

Sanderson has also alleged the other three elements necessary to satisfy his pleading burden. He has alleged that he was otherwise qualified for his job as a planner.  He has also alleged that he suffered an adverse employment action because he was terminated.  And Sanderson alleges that he was terminated just days after Romanino made a derisive remark about his sexual orientation.  That suffices to meet Sanderson's "*minimal* burden" to suggest that he was terminated because of Romanino's perception of his sexual orientation.  *Littlejohn*, 795 F.3d at 311.

But Sanderson's hostile work environment gender discrimination claim is inadequately pleaded.  Sanderson alleges that Romanino joked to coworkers that he was on Martha's Vineyard with his boyfriend.  And Sanderson alleges that Romanino made two disparaging comments—twice asking whether a client contact at Walmart was Sanderson's "boyfriend."  Defendants' attempt to frame these questions as "neutral inquir[ies]" that are "neither inherently derogatory nor offensive" is laughable.  Opp. at 18.  Sanderson has alleged that Romanino intended to embarrass him and that she laughed with a coworker after making these remarks.  As alleged, Romanino was not earnestly asking whether Sanderson's client contacts at Walmart were his boyfriends.  But even so, incidents of discrimination "must be more than episodic" to support a hostile work environment claim. *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).  Rather, "they must be sufficiently continuous and concerted in order to be deemed pervasive." *Harris*, 510 U.S. at 21-22.  No reasonable factfinder could find that the three comments of which Sanderson complains were pervasive enough to create an objectively hostile work environment.  So Sanderson has not plausibly alleged a sex- or gender-based hostile work environment claim.  But he has adequately pleaded an "adverse employment action" theory of sex

---

[11] Sanderson does not specifically allege claims for sexual orientation discrimination under the NYSHRL and NYCHRL. But the Court must construe Sanderson's amended complaint liberally because he is *pro se*.  The Court thus construes the amended complaint to raise claims for sexual orientation discrimination under state and city law.

and sexual orientation discrimination.

### C. Individual Liability Claims

Sanderson has plausibly alleged claims for individual liability against Defendants.  Sanderson seeks to impose individual liability on Spolansky, Diamond, and Romanino under both the NYSHRL and NYCHRL.  "Unlike Title VII, the NYSHRL allows for individual liability.  There are two available theories of liability:  where the individual defendant is considered an 'employer,' or where the defendant aided and abetted the unlawful discriminatory acts of others."  *Xiang v. Eagle Enterprises*, LLC, No. 19 CIV. 1752 (PAE), 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020) (citing N.Y. Exec. Law § 296(1), *id.* § 296(6)).  "An individual defendant is liable as an 'employer' under § 296(1) 'when that individual has an ownership interest in the relevant organization or the power to do more than carry out personnel decisions made by others,' *i.e.*, the power to hire or fire."  *Id.* (quoting *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012)).

"The NYSHRL's aiding and abetting provision makes it unlawful 'for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so.'"  *Id.* (quoting N.Y. Exec. Law § 296(6)).  "The Second Circuit has held that 'this language allows a co-worker who actually participates in the conduct giving rise to a discrimination claim to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff.'"  *Id.* (quoting *Feingold*, 366 F.3d at 158) (brackets omitted).  "This extends to personal liability for aiding and abetting allegedly unlawful discrimination by an employer even where an individual defendant's actions serve as the predicate for the employer's vicarious liability, so long as the employer's conduct has also been found to be discriminatory under the NYSHRL."  *Id.* (citations and quotation marks omitted).

Sanderson has plausibly alleged claims for individual liability against Spolansky.  Defendants argue that Sanderson has not alleged that Spolansky was even indirectly involved in any of the

discrimination he alleges.  But Sanderson has pleaded that Spolansky is the president of Leg Apparel.
In that role, it is reasonable to infer that he exercised the power to hire and fire employees like
Sanderson.  Sanderson has thus alleged that Spolansky is an "employer" within the NYSHRL's
definition.  Although Sanderson asserted a claim for aider and abettor liability, that is only one
theory of individual liability.  And the Court construes Sanderson's complaint liberally because he is
*pro se*.  So the Court will not dismiss Sanderson's claim for individual liability against Spolansky.[12]

Sanderson has also plausibly alleged that Romanino is subject to individual liability.
Defendants argue that Romanino cannot be held liable as an aider and abettor because her
comments about whether Sanderson's client was his "boyfriend" undergird Sanderson's gender
discrimination claim and "an individual cannot aid and abet her own alleged discriminatory
conduct."  Mem. at 16 (citing *Matter of Med. Express Ambulance Corp. v. Kirkland*, 913 N.Y.S.2d 296 (2d
Dep't 2010)).  But the NYSHRL extends personal liability "for aiding and abetting allegedly unlawful
discrimination by an employer even where an individual defendant's actions serve as the predicate
for the employer's vicarious liability, so long as the employer's conduct has also been found to be
discriminatory under the NYSHRL."  *Xiang*, 2020 WL 248941, at *5.  *Kirkland* is also distinguishable.
There, "there was no cognizable legal basis for holding" the employer, Medical Express Ambulance
Corporation, liable under the NYSHRL.  *Kirkland*, 913 N.Y.S.2d at 299.  By contrast, Sanderson has
alleged claims against Leg Apparel and Amiee Lynn, and Defendants do not argue that there is no
basis to hold these entities liable.  So Sanderson has plausibly alleged that Romanino is subject to
individual liability under the NYSHRL.

Sanderson has also plausibly alleged that Spolansky and Romanino are subject to individual
liability under the NYCHRL.  "Since the NYSHRL uses virtually identical language to the applicable

---

[12] Defendants cite *Springs v. City of New York*, No. 17-CV-451 (AJN), 2019 WL 1429567, at *15 (S.D.N.Y. Mar. 29, 2019),
but that case is inapt.  It was decided on summary judgment, and it did not consider the "employer" liability theory.

NYCHRL provision, claims under both statutes are subject to the same analysis." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 450-51 (S.D.N.Y. 2018) (quotation omitted).  Even if the standards are different, the NYCHRL is a "one-way ratchet."  *Mihalik*, 715 F.3d 102, 109.  Because Sanderson has plausibly alleged that Spolansky and Romanino are individually liable under the NYSHRL, he has also done so under the NYCHRL.

### D. Negligent Infliction of Emotional Distress

Sanderson's claim for negligent infliction of emotional distress is dismissed.  In the amended complaint, Sanderson appears to allege an intentional infliction of emotional distress claim.  But in his opposition and sur-reply, Sanderson clarifies that he intended to allege a negligent infliction of emotional distress claim.[13]  "Under New York law, a plaintiff may recover for negligent infliction of emotional distress under one of two theories:  (1) the 'bystander theory' or (2) the 'direct duty theory.'"  *Wahlstrom v. Metro-N. Commuter R.R.*, 89 F. Supp. 2d 506, 531 (S.D.N.Y. 2000) (citations omitted); *see also Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996).  "New York also recognizes a cause of action in cases where there is 'an especial likelihood of genuine and serious mental distress, arising from special circumstances, which serves as a guarantee that the claim is not spurious.'"  *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (quoting *Johnson v. New York*, 37 N.Y.2d 378, 382 (1975).

The "bystander theory" requires the plaintiff to allege that she has "witnessed the death or serious bodily injury of a member of her immediate family."  *Wahlstrom*, 89 F. Supp. 2d at 531 (citing *Mortise*, 102 F.3d at 693).  The "direct duty theory" requires a plaintiff to allege that she "suffered an emotional injury from [a defendant's] breach of a duty which unreasonably endangered her own physical safety" or "caused her to fear for her physical safety."  *Id.* (citing *Mortise*, 102 F.3d at 693;

---

[13] Even if Sanderson sought to bring a claim for intentional infliction of emotional distress, the claim would likely be time barred.  *See Mariani v. Consol. Edison Co.*, 982 F. Supp. 267, 273 (S.D.N.Y. 1997) (observing that there is a one-year statute of limitations for intentional infliction of emotional distress claims under New York law).

*Johnson v. New York City Bd. of Educ.*, 704 N.Y.S.2d 281, 282-83 (2d Dep't 2000)).  "The duty alleged 'must be specific to the plaintiff, and not some amorphous, free-floating duty to society.'" *Id.* (quoting *Mortise*, 102 F.3d at 693).  And "to recover for her emotional injuries, [a] plaintiff must demonstrate that she experienced contemporaneous or consequential physical harm." *Id.* (citing *Bertuzzi v. Chase Manhattan Bank, N.A.*, No. 98 Civ. 5968 (SAS), 1999 WL 759997, at *7 n.3 (S.D.N.Y. Sept. 24, 1999); *Iannotti v. City of Amsterdam*, 639 N.Y.S.2d 537, 538 (3d Dep't 1996)).

Sanderson has not plausibly alleged a negligent infliction of emotional distress claim under any theory.  He has failed to allege any facts that would support a claim for negligent infliction of emotional distress under the bystander theory.  He has also not plausibly alleged that Defendants caused him to fear for his physical safety.  And alleged workplace discrimination does not constitute "special circumstances" that confer a "guarantee of genuineness." *Baker*, 239 F.3d at 421 (quoting *Johnson*, 37 N.Y.2d at 384).  Sanderson has also failed to allege that he experienced any physical harm.  So Sanderson's negligent infliction of emotional distress claim is inadequately pleaded.

## IV. CONCLUSION

Defendants' partial motion to dismiss is GRANTED in part and DENIED in part.  Sanderson's claims for gender-based hostile work environment discrimination and negligent infliction of emotional distress are dismissed.  Sanderson may replead those claims. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").  Any amended complaint must be filed no later than twenty-one days from the date of this order.  If Sanderson chooses not to replead the claims the

Court has dismissed, the parties will continue to litigate the remaining claims.

      The Clerk of Court is directed to terminate the motion pending at Dkt No. 62.

SO ORDERED.

Dated: June 11, 2020

                                   _____
                                        GREGORY H. WOODS
                               United States District Judge