UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
AFTERN SANDERSON,                                          :
                                                          :
                              Plaintiff,                  :
                                                          :
                                                          :
                -v-                                       :
                                                          :
LEG APPAREL LLC, AMIEE LYNN                                :
ACCESSORIES, INC., STEVEN H. SPOLANSKY, :
STUART DIAMOND, and MELISSA                               :
ROMANINO,                                                 :
                                                          :
                              Defendants.   :
                                                          :
------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 3/31/2023

1:19-cv-8423-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

Plaintiff Aftern Sanderson, proceeding *pro se*, brought this employment discrimination action against Defendants Leg Apparel LLC, Amiee Lynn Accessories, Inc., Steven H. Spolansky, Melissa Romanino, and Stuart Diamond, claiming that Defendants discriminated against him and subjected him to a hostile work environment. In particular, Sanderson asserts that his manager Melissa Romanino made discriminatory comments about his perceived sexual orientation and that his colleagues made negative comments about Black people. Sanderson also alleges that, because of his race, he was given a disproportionately heavy workload. In addition, Sanderson claims that Defendants retaliated against him after he filed a complaint with his employer regarding Romanino's allegedly discriminatory comments. Defendants, for their part, deny any liability and have moved for summary judgment in their favor. For the reasons discussed below, Defendants' motion is GRANTED in part and DENIED in part.

I.   **BACKGROUND**

A.  **Factual Background[1]**

Defendant Amiee Lynn Inc.[2] is a fashion accessories designer and marketer in New York. Dkt. No. 180 (Pl.'s Local Rule 56.1 Resp., or "56.1") ¶ 3.  Defendant Leg Apparel, a subsidiary of Amiee Lynn, is a hosiery designer, manufacturer and marketer in New York.  *Id.* ¶ 5.  Plaintiff Aftern Sanderson is an African-American male who worked as a senior merchandise planner for Leg Apparel from January 2015 until his employment was terminated on September 13, 2017.  56.1 ¶¶ 1, 7, 12, 14; Dkt. No. 177-15 ("Aff. of Stuart Diamond") ¶ 18.  Defendant Melissa Romanino was a team leader of Leg Apparel's Planning Department; Defendant Stuart Diamond is the Chief Financial Officer of Leg Apparel; and Defendant Steven Spolansky is the Chief Executive Officer of Leg Apparel and an owner of Amiee Lynn.  56.1 ¶¶ 6–8; Dkt. No. 177-14 ("Aff. of Jennifer Borrelli") ¶ 16.

1.  **Sanderson's Workload**

Sanderson and Romanino initially shared planning responsibilities for Walmart, Leg Apparel's biggest client.  56.1 ¶¶ 16, 19.  Sanderson handled the Ladies' Hosiery division and Walmart Canada, while Romanino was responsible for the Boys' and Girls' division.  *Id.* ¶ 19.  About two to three months after Sanderson began working for Leg Apparel, Romanino went on parental leave.  Deposition of Aftern Sanderson ("Sanderson Dep.") at 74:8–13.  Sanderson covered Romanino's job duties until Romanino returned part-time in September 2015, and Sanderson continued handling at least some of Romanino's job responsibilities until Romanino transitioned to a full-time role in late fall 2015.  *Id.* at 75:12–20, 76:8–22, 76:25–77:9.  For about three months in

---

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements and other submissions in connection with these motions.  The facts are either undisputed or viewed "in the light most favorable to the party opposing summary judgment"—Sanderson—while "drawing all reasonable inferences in [his] favor."  *M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29, 35 (2d Cir. 2022) (quoting *Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022)).
[2] The parties agree that Amiee Lynn Inc. was improperly named as Amiee Lynn Accessories, Inc. in the complaint.  *See* 56.1 ¶ 2.

2015, Sanderson also took on the job responsibilities of an Amiee Lynn planner who had quit, and Sanderson helped train that planner's replacement in the fall of 2015. Sanderson Dep. at 75:8–25, 76:4–6. During the summer of 2015, Sanderson thus held the equivalent of three jobs—his own job, Romanino's job, and the job of the Amiee Lynn planner. *Id.* at 75:18–19.

Upon Romanino's return, Romanino and Sanderson swapped departments, with Romanino taking on the bulk of the responsibilities for Ladies' Hosiery and Sanderson handling a small portion of the work for the Ladies' Hosiery division, as well as the growing Boys' and Girls' division and the Walmart Canada division. *Id.* at 77:12–78:3, 97:7–17, 100:4–24. When Sanderson became overwhelmed with his job responsibilities, Sanderson asked for help and Romanino assisted him. *Id.* at 76:18–19, 79:3–80:12.

In September 2016, Leg Apparel hired Victor Doggett as a senior planner to help Sanderson with the Walmart account and to alleviate Sanderson's workload. 56.1 ¶ 22. Doggett is African-American. *Id.* ¶ 23. Doggett took over the entire Ladies' Hosiery division, while Sanderson handled the Boys' and Girls' division and Walmart Canada. *Id.* ¶ 23; Sanderson Dep. at 101:14–16. Doggett's job performance was lacking, and in December 2016 or January 2017, Leg Apparel fired him. 56.1 ¶¶ 25–26; Sanderson Dep. at 102:19–25, 103:5–15, 104:3–6, 105:2–7.

Doggett was replaced as a senior planner by Marshall Ford, a white male. 56.1 ¶¶ 25, 62. Like Doggett, Ford was responsible for the Ladies' Hosiery division, while Sanderson continued to handle the Boys' and Girls' division and Walmart Canada. *Id.* ¶¶ 27–28. Ford carried the same workload that Doggett had during Doggett's brief tenure at Leg Apparel. Sanderson Dep. at 106:1–7. Sanderson, who sat next to Ford, observed Ford reading articles on his computer on a daily basis. *Id.* at 116:19–20, 117:11–13, 119:9–16; Dkt. No. 181 ("Sanderson Decl.") ¶¶ 3, 13. Ford would also fall asleep and gossip. Sanderson Dep. at 116:20–21, 119:20–120:3. Sanderson was unaware of any complaints from Walmart that Ford had not completed the reports for which Ford had

3

responsibility.  *Id.* at 118:5–12.  Sanderson asked Romanino and Arthur Lavitt, Romanino's

supervisor, whether Ford could help Sanderson with his projects, and Ford assisted Sanderson with

his assignments about three times each week.  *Id.* at 117:13–22; 157:9–14; *see* 56.1 ¶ 57.

     Ford had less experience than Sanderson.  Sanderson Dep. at 116:25–117:1.  Although Ford

had worked with a Walmart affiliate prior to joining Leg Apparel, he did not have prior experience

working directly with Walmart and had to take several training courses about planning for Walmart

when he started at Leg Apparel.  Dkt. No. 180-3 ("Grievance Letter") at 3.[3]  In contrast, Sanderson

had eight years of experience working with Walmart.  *Id.*  Romanino and Lavitt praised Ford's work

on a daily sales report that Ford brought with him to Leg Apparel.  *Id.* at 2.  Sanderson, however,

produced a report that was allegedly more informative than Ford's report.  *Id.*  Ford was invited to

meetings with Walmart in which Ford was asked questions about Sanderson's departments, even

though Ford allegedly had little knowledge about these departments.  *Id.* at 3.  Ford also traveled

with Lavitt to Walmart's office in Arkansas and met with Sanderson's departments.  Sanderson Dep.

at 117:1–4; Grievance Letter at 3.

### 2.  Conduct of Sanderson's Colleagues

     Sanderson's coworkers had loud and raucous conversations while Sanderson had conference

calls with clients at Walmart.  Sanderson Dep. at 93:23, 106:19–23; 56.1 ¶ 57.  These loud

conversations made it more difficult for Sanderson to perform his job effectively, though Sanderson

was still able to do his work.  Sanderson Dep. at 92:25–93:3, 131:13–17, 142:7–14.  Sanderson

---

[3] Sanderson submitted a grievance letter that he purportedly sent to Leg Apparel on September 25, 2017.  Dkt. No. 180-3.  Defendants argue that the grievance letter does not reference admissible evidence as to certain facts.  *See* Dkt. No. 190 at 7-8.  Although the grievance letter itself constitutes hearsay, the letter references facts that Sanderson presumably would be able to testify to at trial based on his own personal knowledge, including—as relevant here—Sanderson's observations about his supervisors' treatment of Ford.  Therefore, mindful of the special solicitude to be afforded to *pro se* litigants, the Court considers the contents of the grievance letter that Sanderson could testify to at trial for the purposes of deciding the summary judgment motion.  *See Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 675–76 (S.D.N.Y. 2012) ("While evidence produced by the party opposing a summary judgment motion need not be in a form that would be admissible at trial, its content must nonetheless be admissible." (internal quotation marks and citations omitted)).

complained to Romanino and to Lavitt about the noise. *Id.* at 141:20–23. In response, both Romanino and Lavitt would tell Sanderson's colleagues to quiet down. *Id.* at 141:24–142:6. Sanderson's coworkers did not have loud and raucous conversations while white colleagues were on the phone with clients. *Id.* at 93:4–6; 106:20–23; 56.1 ¶ 53.

In February 2015, about a month after Sanderson started working at Leg Apparel, Anthony Principe, a white planner, compared Nicki Minaj, who is African-American, unfavorably to Taylor Swift, who is white. 56.1 ¶¶ 15–16, 50. Principe looked directly at Sanderson while making these remarks. Sanderson Dep. at 122:4–10, 123:14–20. Sanderson ignored Principe's comments and did not report this incident to human resources. *Id.* at 124:21–125:5. At some point in 2015, Principe remarked that news anchor Don Lemon, who is African-American, did not deserve his job and was not that intelligent. 56.1 ¶ 50. Principe again looked directly at Sanderson when making this comment. Sanderson Dep. at 126:11–12.

In April 2015, Sanderson's white colleague Kayla Coppola, who sat back-to-back with Sanderson, turned around, looked at Sanderson, and commented on protests by African-Americans in Baltimore. 56.1 ¶¶ 15, 56; Sanderson Dep. at 127:20–128:3, 128:21–129:2. Coppola asked, "what are they complaining of" or made a comment to the effect of "I don't see what they're protesting about." Sanderson Dep. at 128:2–3, 128:21–129:2. At the time that Coppola made the remark, Sanderson was the only African-American in the room. *Id.* at 128:20–22. Sanderson did not tell Coppola that the comment offended him, nor did he report the comment to Romanino. *Id.* at 130:2–9.

Around March 2, 2017, Coppola brought up in conversation that Rachel Dolezal, a former NAACP leader who claimed to Black, was actually white. *Id.* at 129:12–15. Coppola remarked: "Who would pretend to be Black?" *Id.* at 129:15–17. Sanderson did not tell Coppola that this

comment offended him, and also did not report the comment to Romanino or to Human Resources. *Id.* at 131:3–9.

### 3. "Boyfriend" Comments

In July 2017, Sanderson reported on his call with a client at Walmart to Romanino. *Id.* at 107:13–14. At the end of this conversation, Romanino asked Sanderson if the client was Sanderson's boyfriend. *Id.* at 107:14–16. Sanderson was shocked and mortified by Romanino's comment, which Romanino made in the presence of Sanderson's entire team. *Id.* at 109:24–25, 110:10–13. Sanderson's colleagues laughed at Romanino's remark. *Id.* at 111:19–22. Sanderson did not tell Romanino or anyone in human resources that he was offended by Romanino's remark. *Id.*

In September 2017, Sanderson spoke to Romanino about a conference call with another client at Walmart and reported that the call had gone well. *Id.* at 107:18–20, 112:17–20. Romanino again ended the conversation by asking Sanderson, "Is he your boyfriend?" *Id.* at 107:21–22. All of the team members were present for this comment, and again, they responded with laughter. *Id.* at 112:9–11, 113:7–10. Sanderson was shocked and humiliated, but again did not respond to Romanino's comment, and instead sank back into his seat. *Id.* at 112:23–113:1. Sanderson was in disbelief that Romanino had made the "boyfriend' comment for a second time.[4] *Id.* at 113:11–15.

### 4. Sanderson's Internal Complaints and Termination

On September 11, 2017, Sanderson complained about Romanino's "boyfriend" comment in an email that he sent to both Romanino and Jennifer Borrelli, Leg Apparel's Director of Human

---

[4] Sanderson maintains that Coppola, too, made a comment about Sanderson having a boyfriend during Doggett's interview process, and that Sanderson was "mortified" by the incident. *See* Sanderson Dep. at 108:2–25. However, Sanderson was not present for Coppola's alleged comment and only learned about it when Doggett recounted the conversation to him. *See id.* at 108:9–13. Because the only evidence presented as to Coppola's "boyfriend" comment constitutes a hearsay statement that would be inadmissible at trial, the Court does not consider Coppola's alleged statement in evaluating this motion for summary judgment. *See Avola v. Louisiana-Pac. Corp.*, 991 F. Supp. 2d 381, 389 (E.D.N.Y. 2013) ("Even if otherwise inadmissible affidavits and other out-of-court declarations can be considered on summary judgment as the basis for testimony that would be admissible at trial, these declarations cannot contain hearsay statements that would still be inadmissible at trial if the affiants or declarants were to testify to them.").

Resources.  *See* Dkt. No. 177-14 ("Aff. of Jennifer Borrelli") ¶¶ 1, 9; *id.* Ex. C. ("Sanderson Email").

In the email, Sanderson described Romanino's two "boyfriend" comments and stated that he found

the Romanino's comments to be offensive.  *See* Sanderson Email at 1–2.  Sanderson asked

Romanino to refrain from making comments about her perception of Sanderson's sexual

orientation.  *Id.* at 2–3.

Borrelli met with Sanderson to discuss the complaint on September 11, 2017.  Aff. of

Jennifer Borrelli ¶ 9.  Sanderson told Borrelli that he wanted the sexist jokes to stop.  Sanderson

Dep. at 116:2–7.  Borrelli then interviewed Romanino.  *Id.* ¶ 10; Dkt. No. 177-16 ("Aff. of Melissa

Romanino") ¶ 19.  Romanino admitted that she had made the "boyfriend" comment, but she told

Borrelli that she did not believe her comment was inappropriate.  *Id.*  Nonetheless, Romanino

apologized to Sanderson for any hurt that she caused in an email she sent to Sanderson on

September 11, 2017.  *See id.* Ex. D.

During Romanino's conversation with Borrelli, Romanino reported that Sanderson had

ongoing behavioral issues, and that Romanino had complained about Sanderson's unprofessional

behavior to Nelly Perrone, the former director of Human Resources at Leg Apparel, in January

2017.  Aff of Melissa Romanino ¶¶ 11–14, 16, 20.[5]  Romanino did not ask Perrone to take

disciplinary action against Sanderson because Romanino wished to resolve workplace issues

amicably and informally, rather than jeopardize Sanderson's job.  *Id.* ¶ 15.  At Borrelli's request,

Romanino sent an email to Borrelli describing Sanderson's inappropriate behavior.  *Id.* ¶ 20.

Romanino also told Borrelli that Sanderson's recent work performance was subpar.  *Id.* ¶ 21.

---

[5] Romanino and Coppola submitted affidavits describing inappropriate comments allegedly made by Sanderson.  *See* Aff. of Melissa Romanino ¶¶ 12-14; Dkt. No. 177-13 ("Aff. of Kayla Coppola") ¶¶ 5–8.  Sanderson denies that he made inappropriate comments, though he does admit to making a joke that Romanino was a "Real Housewife of Poughkeepsie."  *See* 56.1 ¶¶ 33–34; Sanderson Dep. at 146:13–150:10.  Because the parties dispute whether Sanderson made the comments that were the subject of Romanino's complaints, the Court does not consider these comments at the summary judgment stage.  *See M.A.*, 53 F.4th at 35.

Borrelli launched an investigation into Sanderson's conduct, and interviewed Coppola and Perrone. Aff. of Jennifer Borrelli ¶¶ 13–14. On September 13, 2017, Borrelli received emails from Coppola and Ford, in which they complained about Sanderson's unprofessional behavior. *Id.* ¶¶ 13, 15; *id.* Exs. C, G. On September 13, 2017, Borrelli also received an email from Romanino stating that her team was "revolting." *Id.* ¶ 16; *id.* Ex. F.

Although Borrelli typically interviews the employees who are named in complaints as part of her investigation, Borrelli did not interview Sanderson regarding any of the complaints made against him. *See id.* ¶¶ 8–16. When Borrelli received the email from Romanino stating that her team was in revolt, Borrelli immediately met with Leg Apparel's management team, including Stuart Diamond, the Chief Financial Officer (CFO) of Leg Apparel, and Steven Spolansky, Leg Apparel's Chief Executive Officer (CEO). *Id.* ¶ 16. Borrelli reported the findings of her investigation. *Id.* ¶ 17. Although the management team had previously deferred to Romanino's request that Leg Apparel not discipline Sanderson, the management team decided to terminate Sanderson's employment after realizing for the first time "the breadth and depth of Sanderson's inappropriate behavior in the workplace." *See* Aff. of Stuart Diamond ¶ 14 (stating that "[w]hile Romanino, as [Sanderson's] direct team leader, may choose to tolerate Sanderson's disrespectful behavior toward her, the Company could not ignore or tolerate Sanderson's inappropriate behavior towards his team members"). Management did not consult with Romanino regarding the decision to fire Sanderson. Aff. of Melissa Romanino ¶ 23. Romanino also did not have the authority to hire, discipline, or fire employees, though Leg Apparel's management team often asked for her opinion. *Id.* ¶ 10.

On September 13, 2017, Diamond, with Borrelli present, called Sanderson to inform him that he was being terminated immediately. Aff. of Stuart Diamond ¶ 18.

### B. Procedural History

Sanderson took legal action two days after his termination by filing a complaint with the Equal Employment Opportunity Commission ("EEOC") on September 15, 2017.  Dkt. No. 177-1. Less than a month later, on October 11, 2017, he filed another administrative complaint with the New York State Division of Human Rights ("NYSDHR").  Dkt. No. 177-2.  The NYSDHR, not the EEOC, pursued Sanderson's administrative case under a work-sharing agreement between the entities.  *See* Dkt. No. 129 (Third Amended Complaint, or "TAC") Ex. M.  On March 30, 2018, the NYSDHR made a preliminary determination that Leg Apparel had engaged in retaliation or discrimination, *id.* Ex. K, though Leg Apparel would later request that this determination be reopened, Dkt. No. 177-5.  Ultimately, Sanderson requested an administrative closure so that he could sue in federal court.  TAC Ex. P.  That request was granted, and Sanderson received a Right to Sue letter from the EEOC in August 2019.  TAC Exs. Q, S.

Sanderson began his federal case in front of this Court in September 2019.  Dkt No. 1.  He amended his complaint several times, and his active complaint for the purposes of this motion is his Third Amended Complaint, filed on January 4, 2021.  Dkt. No. 129.  That complaint asserts eleven claims for relief.  Counts one, three, five, and eight assert claims for race and gender discrimination under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL").  TAC ¶¶ 85–90, 95–101, 106–112, 122–128.  Counts two, four, six, and nine assert claims for retaliation under those same statutes.  *Id.* ¶¶ 91–94, 102–105, 113–116, 129–132.  Counts seven and ten allege that Spolansky, Romanino, and Diamond aided and abetted violations of the NYSHRL and the NYCHRL.  *Id.* ¶¶ 117–121, 133–137.  And count eleven asserts a claim for a hostile work environment under the NYCHRL.  *Id.* ¶¶ 138–143.[6]

---

[6] Though count eleven only references the NYCHRL, Sanderson's complaint otherwise makes clear that he intends to

On December 15, 2021, Defendants moved for summary judgment as to all of Sanderson's

claims.  Dkt. No. 170 (motion); Dkt. No. 172 (memorandum in support, or "Defs' Mem.").

Defendants also submitted their Local Rule 56.1 statement of undisputed material facts the next day.

Dkt. No. 177-17.  Sanderson responded to Defendants' 56.1 statement on January 19, 2022.  Dkt.

No. 180 ("56.1").  Defendants filed a reply brief on February 2, 2022.  Dkt. No. 189 ("Reply").

Sanderson then filed his opposition brief to Defendants' summary-judgment motion on February

14, 2022.  Dkt. No. 193 ("Pl's Opp.").  Defendants filed a sur-reply on February 28, 2022.  Dkt. No.

196.  And Sanderson filed a sur-sur-reply on June 6, 2022.  Dkt. No. 223.

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  A

genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the

governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are

irrelevant or unnecessary will not be counted."  *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence

---

allege a hostile work environment under every statute—Section 1981, Title VII, and the NYSHRL, as well as the
NYCHRL—cited in his complaint.  *See* TAC ¶ 87 (alleging a hostile work environment under Section 1981); *id.* ¶ 97
(same as to Title VII); *id.* ¶ 108 (same as to NYSHRL).  The Court will accordingly consider his hostile work
environment claims under each statute.

sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

In employment discrimination cases, where direct evidence of intentional discrimination is rare, "affidavits and depositions must be carefully scrutinized for circumstantial proof" of discrimination. *Turner v. NYU Hosps. Ctr.*, 784 F. Supp. 2d 266, 275 (S.D.N.Y. 2011) (citing *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994)), *aff'd*, 470 F. App'x 20 (2d Cir.

2012).  "However, even in such cases, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment and show more than some metaphysical doubt as to material facts."  *Id.* at 275–76 (internal quotation marks omitted) (first quoting *Schwapp v. Town of Avon*, 118 F. 3d 106, 110 (2d Cir. 1997); and then quoting *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

Where, as here, the party opposing summary judgment is proceeding *pro se*, the Court must construe that party's complaint "liberally to raise the strongest arguments it suggests."  *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014).  "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014); *accord Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016).  Proceeding *pro se*, however, "does not . . . relieve [a pro se party opposing summary judgment] from the usual requirements of" opposing such a motion.  *Fitzpatrick v. N.Y. Cornell Hosp.*, No. 00-cv-8594, 2003 WL 102853, at *5 (S.D.N.Y. Jan. 9, 2003).

As was done in this case, "[i]f the moving party seeks summary judgment against a *pro se* litigant, the moving party is also required to notify the *pro se* litigant of the requirements of Rule 56 and Local Civil Rule 56.1."  *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009); *see* Dkt. No. 177-18 ("Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment Pursuant to Local Rule 56.2").  "*Pro se* litigants are then not excused from meeting the requirements of Local Rule 56.1."  *Wali*, 678 F. Supp. 2d at 178 (citing *Vt. Teddy Bear Co. v. 1–800–BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir. 2004)).  However, "where a *pro se* plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions."  *Id.* (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)).

Here, much of Sanderson's response to Defendants' Rule 56.1 statement, *see* Dkt. No. 180, failed to comply with Local Rule 56.1(b), either because it did not include numbered paragraphs containing material facts that he believed presented a genuine issue to be tried, or because it relied on legal conclusions in lieu of facts. *See* Local Civ. R. 56.1(b) (requiring that "[t]he papers opposing a motion for summary judgment" "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried").  Nonetheless, exercising its discretion given Sanderson's *pro se* status, the Court has independently reviewed the complete record of the case and considered the admissible evidence that he has introduced to determine whether there exist any disputed issues of material fact that preclude summary judgment on Sanderson's claims.

## III.    DISCUSSION

Because Sanderson has introduced evidence that a jury could reasonably believe supports a finding that he was treated less well than others based on his protected characteristics, but has not produced evidence connecting any alleged discrimination to an adverse employment action, Defendants' motion for summary judgment will be denied as to Sanderson's NYCHRL discrimination claim but granted as to Sanderson's discrimination claims under Section 1981, Title VII, and the NYSHRL.  Further, as Sanderson's evidence could support a finding that Defendants' explanation for his termination was pretextual, and that Sanderson was in fact fired for opposing what he believed to be discrimination based on the perception that he was gay, Defendants' motion for summary judgment will be denied as to Sanderson's retaliation claims under Title VII, the NYSHRL, and the NYCHRL based on that protected conduct.  Finally, Defendants' summary-judgment motion will be denied in full as to Sanderson's claims for individual liability against

Spolansky and Diamond—as they can be categorized as Sanderson's "employer" under the NYSHRL and the NYCHRL—and will be denied in part as to Sanderson's claims for individual liability against Romanino; aiding-and-abetting claims against her connected to alleged discrimination may go forward, but analogous aiding-and-abetting claims linked to alleged retaliation may not.

### A. Discrimination Claims

Sanderson has alleged that he was discriminated against based on his race in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the NYSHRL, and the NYCHRL. *See* TAC ¶¶ 85–90, 95–101, 106–112, 122–128, 138–143. He has also alleged discrimination based on his perceived sexual orientation in violation of the same statutes (except for Section 1981, which protects only against race-based discrimination). *See id.* ¶¶ 95–101, 106–112, 122–128, 138–143.[7] While Sanderson has failed to adduce sufficient evidence to support his Section 1981, Title VII, or NYSHRL claims, a jury could reasonably view his evidence as sufficient to show that he was treated "less well" than others based on a protected characteristic, which is all that is required under the NYCHRL. Accordingly, summary judgment will be granted as to Sanderson's Section 1981, Title VII, and NYSHRL discrimination claims, but will be denied as to his NYCHRL discrimination claim.

   1.   Legal Standards

      i.   *Section 1981, Title VII, and NYSHRL*

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall

---

[7] Sanderson's complaint uses the term "gender," rather than "perceived sexual orientation" to describe this protected characteristic. *See, e.g.,* TAC ¶ 96. But the content of his allegations makes clear that he is alleging discrimination based on his perceived sexual orientation. *See, e.g., id.* ¶ 33 (Sanderson alleging discrimination based on the perception that he had a boyfriend). Reading Sanderson's *pro se* complaint "liberally to raise the strongest arguments it suggests," *Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir. 2014), the Court will cast all of Sanderson's discrimination and retaliation claims that he terms gender-based as instead based on perceived sexual orientation—which is a protected status under Title VII, the NYSHRL, and the NYCHRL. *See Zarda v. Altitude Express, Inc.,* 883 F. 3d 100, 122 (2d Cir. 2018) (Title VII); *Rohn Padmore, Inc. v. LC Play, Inc.,* 679 F. Supp. 2d 454, 462 (S.D.N.Y. 2010) (NYSHRL); N.Y.C. Admin. Code § 8-107(1)(a) (NYCHRL).

have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).  "Subsection (c) explicitly applies Section 1981 to private discrimination . . . ."  *Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 301 (2d Cir. 2006).  Title VII makes it an "unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2. Finally, the NYSHRL prohibits "an employer . . . because of an individual's race . . . sexual orientation, [or] gender identity or expression[,] . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment."  N.Y. Exec. L. § 296(1)(a).

a.   Disparate-Treatment Discrimination[8]

Disparate-treatment discrimination claims under Section 1981, Title VII, and the NYSHRL "are governed at the summary judgment stage by the burden-shifting analysis" established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).  *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *see Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) ("We analyze [the plaintiff's] Title VII, § 1981, and NYHRL discrimination claims under the familiar burden-shifting framework set forth in *McDonnell Douglas*.").  Under the *McDonnell Douglas* framework, Sanderson "bears the initial burden of establishing a prima facie case of discrimination."

---

[8] "Disparate treatment" is the nomenclature often used by the Second Circuit to describe what might more naturally be termed "normal" or "typical" employment discrimination claims—that a plaintiff was discriminated against through an "employment decision based in whole or in part on intentional discrimination." *Chin v. Port Auth. Of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012).

*Holcomb*, 521 F.3d at 138.  To establish a *prima facie* case, Sanderson "must show:  (1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown*, 673 F.3d at 150 (quoting *Holcomb*, 521 F.3d at 138).  "A plaintiff's burden of establishing a *prima facie* case is *de minimis*."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).

"Establishment of a *prima facie* case 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'"  *Adeniji v. Admin. for Children Servs.*, 43 F. Supp. 2d 407, 419 (S.D.N.Y. 1999) (quoting *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335 (2d Cir. 1997)), *aff'd*, 201 F.3d 430 (2d Cir. 1999).  If the plaintiff meets that initial burden, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action.  *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014).  At this stage of the *McDonnell Douglas* framework, the Court asks whether Defendants have "introduced evidence that '*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason.'"  *Holcomb*, 521 F.3d at 141 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's*, 509 U.S. at 509).

If the employer meets its burden of supplying a non-discriminatory reason, the presumption of discrimination raised by the *prima facie* case is rebutted, and the burden returns to the plaintiff to point to evidence from which a reasonable jury could conclude that the employer's stated reasons are merely a pretext for unlawful discrimination.  *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016).  At the pretext stage, a plaintiff must provide "facts sufficient to warrant a reasonable jury finding by a preponderance of the evidence that 'the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext for [discrimination].'"

*Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. Mar. 25, 2010) (summary order)

(quoting *Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 125 n.11 (2d Cir. 2008)).

b.   Hostile Work Environment Claims

Section 1981, Title VII, and the NYSHRL all provide a cause of action for employment

discrimination based on a hostile work environment.  *See Rivera v. Rochester Genesee Regional Transp.*

*Auth.*, 743 F.3d 11, 20 & n.4 (2d Cir. 2014) (considering a hostile work environment claim brought

under all three statutes).  As is the case for disparate-treatment discrimination claims, the standard

for evaluating hostile work environment claims is the same under each statute.  *Id.* at 20 n.4.

"To establish a hostile work environment claim under [these statutes], a plaintiff must first

produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and

insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'"

*Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 68 (2d Cir. 2023) (quoting *Cruz v. Coach Stores, Inc.*, 202

F.3d 560, 570 (2d Cir. 2000)).  "That analysis includes both an objective and a subjective

component:  '[a] work environment will be considered hostile if a reasonable person would have

found it to be so and if the plaintiff subjectively so perceived it.'"  *Id.* at 69 (quoting *Brennan v. Metro.*

*Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)) (alteration in *Williams*).  "A hostile work

environment is shown when 'a single incident was extraordinarily severe, or that a series of incidents

were sufficiently continuous and concerted' to be deemed 'pervasive.'"  *Id.* (quoting *Alfano v. Costello*,

294 F.3d 365, 374 (2d Cir. 2002)); *see also Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir.

2105) ("The incidents complained of must be more than episodic; they must be sufficiently

continuous and concerted in order to be deemed pervasive." (internal quotation marks and citations

omitted)).  In sum, "[i]n determining whether a plaintiff suffered a hostile work environment, we

must consider the totality of the circumstances, including the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

17

utterance; and whether it unreasonably interferes with an employee's work performance." *Littlejohn*, 795 F.3d at 321 (internal quotation marks and citations omitted).[9]

> ii.  *NYCHRL*

Section 8-107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the . . . race, . . . color[, or] national origin . . . of any person, . . . to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a).  A plaintiff may bring claims under the NYCHRL for both discrimination and hostile work environment.  *See Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 658 (E.D.N.Y. 2015).  "Because claims for hostile work environment and discrimination are governed by the same provision of the NYCHRL, they are analyzed under the same standard." *Bacchus v. N.Y. City Dep't of Educ.*, 137 F. Supp. 3d 214, 246 (E.D.N.Y. 2015).

Unlike Section 1981, Title VII, and the NYSHRL, the NYCHRL "does not require 'a connection between the discriminatory conduct and a materially adverse employment action.'" *Garrigan v. Ruby Tuesday, Inc.*, No. 14-cv-155, 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 114 (2d Cir. 2013)).  That lower standard reflects the fact that the NYCHRL acts as a "one-way ratchet, by which interpretations of state and federal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall." *Mihalik*, 715 F.3d at 109 (internal quotation marks omitted).  Accordingly, "[t]o establish a . . . discrimination claim under the NYCHRL, the plaintiff need only demonstrate

---

[9] While some courts have erroneously applied the *McDonnell Douglas* burden-shifting framework to hostile work environment claims, "*McDonnell Douglas* is not the proper framework to analyze hostile work environment claims." *Pape v. Dircksen & Talleyrand Inc.*, No. 16-cv-5377, 2019 WL 1435882, at *10 (E.D.N.Y. Feb. 1, 2019); *see id.* at *10 n.4 (further explaining why application of *McDonnell Douglas* to such claims is erroneous under Second Circuit precedent).  For confirmation that *McDonnell Douglas* does not apply to such claims, one need look no further than the Second Circuit's recent published decision in *Williams v. New York City Housing Authority*, which evaluated hostile work environment claims without engaging in any burden shifting.  *See generally* 61 F.4th 55.

'by a preponderance of the evidence that [he] has been treated less well than other employees because of [a protected characteristic].'" *Id.* at 110 (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)); *see also Bacchus*, 137 F. Supp. 3d at 246 (noting that "[t]o defeat summary judgment on a discrimination . . . claim" under the NYCHRL, "the plaintiff 'need only show that her employer treated her less well, at least in part for a discriminatory reason.'" (quoting *Mihalik*, 715 F.3d at 110)).  "The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes . . . that discrimination play[ed] *no* role in its actions." *Williams*, 61 F.4th at 69 (quoting *Mihalik*, 715 F.3d at 110 n.8).

Nonetheless, the NYCHRL "is not a 'general civility code.'" *Id.* (quoting *Mihalik*, 715 F.3d at 110).  "[E]ven if 'the plaintiff establishes that [he] was treated less well because of [his protected characteristics], defendants may assert an affirmative defense whereby [they] can still avoid liability if . . . the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." *Id.* (quoting *Mihalik*, 715 F.3d at 110–11).  New York courts interpreting the NYCHRL, however, have emphasized that this affirmative defense should be used only to dismiss "truly insubstantial cases," because "a jury made up of a of a cross-section of our heterogeneous communities"—not a court—"provides the appropriate institution for deciding whether borderline situations should be characterized as" discriminatory. *Williams*, 872 N.Y.S.2d at 41 (quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998)).

2.   Analysis

i.   *Section 1981, Title VII, and NYSHRL*

a.   Disparate-Treatment Claims

Sanderson has failed to adduce evidence that a jury could reasonably find supports any of his

disparate-treatment claims under Section 1981, Title VII, or the NYSHRL.  To establish a *prima facie* case of discrimination based on race or perceived sexual orientation, he "must show [that]:  (1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown*, 673 F.3d at 150 (quoting *Holcomb*, 521 F.3d at 138).

Sanderson belongs to a protected class for both his race and perceived-sexual-orientation based claims.  TAC ¶¶ 3, 33 (Sanderson noting that he is African-American and was perceived as gay).  And Defendants do not challenge that Sanderson was qualified for the position he held.  *See* Defs' Mem. at 12.  But his *prima facie* case fails because he does not connect any alleged discrimination to an adverse employment action that he suffered.

An adverse employment action is "a materially adverse change in the terms and conditions of employment such as termination, demotion evidenced by a decrease in salary or wage, being given a less distinguished title, a material loss in benefits, significantly diminished material responsibilities, or some other action deleterious to the plaintiff's current or future employment." *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 43 (2d Cir. 2019) (internal quotation marks, citation, and emphasis omitted).  The action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Terry*, 336 F.3d at 138).

To start, Sanderson alleges that his termination was a retaliatory act, rather than a discriminatory one.  The evidence he has introduced into the record makes this position clear.  *See* Sanderson Dep. at 169:16–170:3 ("Q:  You also, sir, claim [ ] retaliation in your Complaint.  How did the Defendants retaliate against you?  A:  When I wrote the Complaint letter on September 11th[, 2017], and they subsequently fired me two days later, I was opposing discrimination, *and they*

*retaliated.* Q: What is your claim with respect to the reason why they retaliated? . . . A: Because I opposed discrimination in the letter I sent on September 11th." (emphasis added)); Grievance Letter at 3 ("The reasons for my termination are clear to me. *This was a retaliatory dismissal.*" (emphasis added)). As Sanderson's evidence can only be fairly read to allege that his termination was retaliatory, rather than discriminatory, that termination cannot serve as an adverse action underlying his discrimination claims.[10]

Instead, the "adverse action" that Sanderson alleges in support of his race-based discrimination claims is the alleged differential treatment that he experienced compared to Ford, the white senior planner hired to alleviate Sanderson's workload. *See* 56.1 ¶ 22.[11] Specifically, Sanderson alleges that he carried a higher workload than Ford, as Ford was allowed to read computer articles at his desk, gossip, and would sometimes fall asleep on the job. *See* Sanderson Dep. at 116:19-20, 117:11-13, 119:9-16. Sanderson further states that while he and Ford both wrote sales reports, and that Sanderson's was better, Ford—not Sanderson—was praised for the reports. Grievance Letter at 2–3. And he claims that Ford was taken on work trips with Lavitt to meet with Sanderson's department in Arkansas, which was an opportunity that Sanderson should have had. Sanderson Dep. at 117:1-4, Grievance Letter at 3.

None of these allegations, however, represent the kind of "materially adverse change in the terms and conditions of [Sanderson's] employment" that is actionable under Section 1981, Title VII,

---

[10] Nor do the facts otherwise support any reasonable inference that Sanderson's termination could have been discriminatory. None of the people who are alleged to have engaged in any discriminatory incidents were involved in Sanderson's firing; to the contrary, Romanino advocated *against* his firing. See Aff. of Melissa Romanino ¶ 23 ("Management did not consult with me regarding the decision to terminate Sanderson's employment."); Aff. of Stuart Diamond ¶ 14 ("We were aware that Romanino . . . had requested that [Leg Apparel] not discipline [Sanderson]. . . . While Romanino, as [Sanderson's] direct team leader may choose to tolerate [Sanderson's alleged behavior], [Leg Apparel] could not ignore [it]."). And there is no evidence that suggests that those who did terminate him engaged in any discriminatory conduct or otherwise harbored any animus against Sanderson based on his protected characteristics. Given these facts, the Court understands why Sanderson has cast his termination as the result of retaliation for his protected conduct rather than as the result of discrimination against him on the basis of his protected characteristics.

[11] The other incidents to which Sanderson points—alleged comments and actions by his coworkers with no tangible effect on his workload or job position—are plainly not adverse employment actions, but will be considered as part of the Court's hostile workplace environment analyses. *See infra* Part III(A)(2)(i)(b) and Part III(A)(2)(ii).

or the NYSHRL.  *Davis-Garett*, 921 F.3d at 43.  It is true that "the assignment of 'a disproportionately heavy workload' can constitute an adverse employment action" under these statutes.  *Vega*, 801 F.3d at 85 (quoting *Feingold v. New York*, 366 F.3d 138, 152–53 (2d Cir. 2004)).  But to the Court's knowledge, every case in which such a workload has been considered an adverse employment action involves the assignment of *extra* work to the aggrieved employee, rather than allowing a different employee to do *less* work without receiving consequences.  *See, e.g.*, *Vega*, 801 F.3d at 88 (finding that the assignment of a math teacher to "classes with increased numbers of Spanish-speaking students" was an adverse employment action because the teacher "was forced to spend disproportionately more time preparing for his classes and therefore experienced a *material increase in his responsibilities* without additional compensation" (emphasis added)); *Feingold*, 366 F.3d at 153 (finding that the reassignment of cases from African-American Administrative Law Judges to white Administrative Law Judges, and the regular reassignment of other work in the same manner, could constitute adverse employment actions).

Sanderson does not attest that he was given additional work when Ford was hired.  To the contrary:  he admits that Ford carried the same workload as Doggett, the Black planner that Ford replaced.  *See* Sanderson Dep. at 106:1–7 ("Q:  So, Marshall Ford basically stepped into Victor Doggett's shoes with respect to Wal-Mart?  A:  Yes, basically.  Q:  So, Marshall Ford carried the same workload that Victor Doggett carried while he was there?  A:  Yes.").  In other words, while Sanderson points to Ford's alleged failings as a Leg Apparel employee, he does not allege that any of those failings resulted in Sanderson taking on additional work as compared to his workload pre-Ford.  *See also id.* at 102:1–2 (Sanderson noting that he also carried a heavier workload than Doggett).  So Sanderson does not point to any "materially adverse *change* in the terms and conditions of [his] employment" traceable to Ford's allegedly lackluster work performance.  *Davis-Garett*, 921 F.3d at 43

(emphasis added).

Finally, Sanderson's other allegations about supposed favoritism of Ford—that he, not Sanderson, was praised for certain work reports and that he, not Sanderson, was permitted to take a work trip with Leavitt, *see* Grievance Letter at 2–3—do not represent the kind of "material loss in benefits" or "significantly diminished material responsibilities" that are actionable under Section 1981, Title VII, or the NYSHRL.  *Davis-Garett*, 921 F.3d at 43.  Instead, they exemplify the "everyday workplace grievances, disappointments and setbacks" that "do not constitute adverse employment actions" under these statutes.  *La Grande v. DeCrescente Distributing Co., Inc.*, 370 F. App'x 206, 211 (2d Cir. Mar. 23, 2010) (summary order) (citing *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)); *see also Vega*, 801 F.3d at 85 (materially adverse actions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities").  Even reading Sanderson's allegations broadly—as the Court must given his *pro se* status—these incidents do not rise to an actionable level under Section 1981, Title VII, or the NYSHRL.

When he turns from race-based claims to those based on his perceived sexual orientation, moreover, Sanderson provides even less support for any adverse employment action.[12]  His allegations relevant to his perceived sexual orientation discrimination claims are the two times that, after Sanderson got off of client calls, Romanino allegedly asked whether the client was Sanderson's boyfriend.  *See* Sanderson Dep. at 107:13–16, 107:18–22.  While Sanderson reports that he was "shocked, completely taken back, [and] embarrassed and mortified" by these comments, *see id.* at 109:18–20, he does not allege that any of his actual employment responsibilities were altered (by Romanino or anyone else) as a result.  Therefore, Sanderson has failed to properly allege—let alone introduce sufficient evidence so that a jury could reasonably find—that he suffered a "material loss

---

[12] The Court notes that Sanderson's allegations based on his perceived sexual orientation could not support any claim under Section 1981, which protects only against race-based discrimination and retaliation.  *See* 42 U.S.C. § 1981; *Vill. of Freeport v. Barrella*, 814 F.3d 594, 604–05 (2d Cir. 2016).

in benefits" or "significantly diminished material responsibilities" related to alleged discrimination

based on his perceived sexual orientation. *Davis-Garett*, 921 F.3d at 43.

In sum, as Sanderson has not adduced sufficient evidence for a jury to reasonably find that

he suffered an adverse employment action based on discrimination against him, he cannot support

his *prima facie* case for disparate treatment under *McDonnell Douglas*. Accordingly, Defendants'

motion for summary judgment will be granted as to Sanderson's disparate-treatment claims under

Section 1981, Title VII, and the NYSHRL.

### b. Hostile Work Environment Claims

Sanderson has also failed to adequately support his claims for a hostile work environment

under Section 1981, Title VII, and the NYSHRL. That is because, as alleged, the incidents that

Sanderson experienced do not objectively represent "evidence that '[his] workplace [was] permeated

with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to

alter the conditions of [his] employment." *Williams*, 61 F.4th at 68 (quoting *Cruz*, 202 F.3d at 570).

 As an initial matter, the Court will consider all of the incidents that Sanderson alleges

together. While "discrete retaliatory or discriminatory act[s] 'occur[ ]' on the day that [they]

'happen[ ]'"—and so a party must file a charge based on such an act within a certain number of days

of the occurrence of that act—"[h]ostile environment claims are different in kind from discrete acts"

such that an "employee need only file a charge within [a time limit] of *any* act that is part of the

hostile work environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 115, 119 (2002)

(emphasis added). Here, the final incident relevant to Sanderson's hostile work environment

claims—the latter of Romanino's "boyfriend" comments—occurred on September 7, 2017. TAC

¶ 33; *see* Sanderson Dep. at 111:23–112:22. Sanderson filed his initial discrimination charges with

the EEOC in September 2017 and with the NYSDHR in October 2017, *see* Dkt. Nos. 177-1, 177-2,

well within the limits applicable to timely filing of such claims. *See Dezaio v. Port Auth. of NY & NJ*,

205 F.3d 62, 64 (2d Cir. 2000). Further, the incidents that Sanderson alleges related to race and his perceived sexual orientation can also be considered together. *See Daniel v. T&M Protection Res., LLC*, 689 F. App'x 1, 4 (2d Cir. Apr. 25, 2017) (summary order) (noting that evidence that a plaintiff "was harassed on multiple fronts" should "be considered when evaluating [the plaintiff's] work environment as a whole") (citing *Cruz*, 202 F.3d at 572); *see also Mehta v. City of New York*, No. 19-cv-3857, 2022 WL 280460, at *10 (E.D.N.Y. Jan. 31, 2022) (applying *Daniel* and "aggregat[ing] together" conduct based on multiple protected characteristics for purposes of a hostile work environment claim). So the Court can, and will, consider all of the incidents that Sanderson raises to support his hostile work environment claims together.

Even doing so, however, Sanderson has not pointed to sufficient evidence of "severe or pervasive" conduct that could have reasonably "alter[ed] the conditions of [his] employment." *Williams*, 61 F.4th at 68. The hostile work environment inquiry has "both an objective and a subjective component: [a] work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Id.* at 69 (internal quotation omitted). Sanderson has sufficiently alleged that he subjectively perceived his work environment as hostile. *See, e.g.*, Sanderson Dep. at 109:22–110:2 (noting that after one of Romanino's "boyfriend" comments, he was "shocked, completely taken back, embarrassed and mortified," and "just sank back in [his] seat").

But the incidents that Sanderson alleges do not rise to the level of an *objectively* hostile work environment. Taken together, Sanderson's hostile workplace allegations are: (1) that Principe compared Nikki Minaj unfavorably to Taylor Swift, 56.1 ¶¶ 15–16, 50; (2) that Principe denigrated news anchor Don Lemon, 56.1 ¶ 50; (3) that Coppola commented something to the effect of "I don't see what they're protesting about" concerning the protests in Baltimore following Freddie Gray's death, Sanderson Dep. at 128:21–129:2; (4) that, in response to Rachel Dolezal's false claim

of being Black, Coppola asked: "Who would pretend to be Black?," *id.* at 129:12–17; (5) that certain

of his colleagues would have "loud and raucous conversations" during his conference calls, but not

during the calls of other (non-Black) employees, *id.* at 106:15–23, and (6) that Romanino made the

two comments about Sanderson's clients being his "boyfriend," *id.* at 107:10–22.

To evaluate Sanderson's hostile work claims, the Court must consider "the totality of the

circumstances" "cumulatively," with a particular focus on the "frequency and severity of the

conduct." *Williams*, 61 F.4th at 74 (internal quotation marks and citation omitted). Here, Sanderson

points to a handful of instances over roughly two-and-a-half years. *See* Sanderson Dep. at 123:4–6

(the comment about Nikki Minaj and Taylor Swift was in February 2015); *id.* at 107:17–22

(Romanino's second "boyfriend" comment was in September 2017). This is "a rate of occurrence

which courts have found to be infrequent." *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d

141, 182 (E.D.N.Y. 2015) (collecting cases in which, for instance, frequencies of five occasions over

fourteen months, five comments over thirteen months, and five incidents over seventeen months

were found not to represent "pervasive" harassing conduct).

As to severity, Sanderson's allegations simply do not constitute the kind of "racist [or

otherwise bigoted] comments, slurs, and jokes" that typically undergird a hostile work environment

claim. *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 83 (2d Cir. 2009) (quoting *Schwapp v.*

*Town of Avon*, 118, F.3d 106, 110–11 (2d Cir. 1997)). While it would certainly be possible to construe

one or more of the incidents that Sanderson alleges as having racial or sexual-orientation-based

undertones, none of them are so severe that an objective observer could view them as altering one's

work environment. *See, e.g., Garcia v. NYC Health & Hosps. Corp.*, No. 19-cv-997, 2019 WL 6878729,

at *7 (S.D.N.Y. Dec. 17, 2019) (concluding that an incident where the plaintiff was publicly

questioned about his disability by his supervisor did not constitute a hostile work environment even

where coupled with four incidents where his supervisor yelled at or was aggressive towards him and

an incident where the plaintiff believed his supervisor referred to him as a "f*****" in another language (asterisks added)); *LeGrand v. WalMart Stores E., LP*, 779 F. App'x 779, 781 (2d Cir. July 11, 2019) (summary order) (holding that the plaintiff properly alleged a hostile work environment where her supervisor called her "r*******," disclosed her disability to others and referred to her using racial epithets among other employees (asterisks added)); *see also* Sanderson Dep. at 142:7–14 (noting that his co-workers' allegedly raucous conversations did not prevent Sanderson from completing his calls or his work). Rather, while some of these statements lacked tact, may have been based on stereotype, and perhaps reflected a lack of social awareness, they were the kinds of "simple teasing, offhand comments, and isolated incidents" that do "not amount to discriminatory changes in the terms and conditions of employment." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (internal quotation marks omitted). Accordingly, Sanderson has failed to adduce evidence that could support a jury finding of a hostile work environment under Section 1981, Title VII, or the NYSHRL.

### ii.   *NYCHRL*

Unlike his discrimination claims under Section 1981, Title VII, and the NYSHRL, Sanderson has presented sufficient evidence for his NYCHRL discrimination claim to survive summary judgment. That is because under the NYCHRL, Sanderson need not prove any "connection between . . . discriminatory conduct and a materially adverse employment action." *Mihalik*, 715 F.3d at 114. Instead, he ultimately "need only demonstrate 'by a preponderance of the evidence that [he] has been treated less well than other employees because of [his protected characteristics].'" *Id.* at 110 (quoting *Williams*, 872 N.Y.S.2d at 39).

Sanderson has presented sufficient evidence to defeat Defendants' motion on this claim. First, he has introduced evidence, in the form of his sworn testimony, that he was treated less well than Ford. *See* Sanderson Dep. at 116:19-20, 117:11-13, 119:9-16 (stating that Ford was allowed to

read computer articles at his desk, gossip, and fall asleep while Sanderson was not).  And he has

produced evidence that a jury could find supports a reasonable inference that this differential

treatment was based on race:  while Doggett—Ford's Black predecessor—was fired for substandard

performance, Ford was not, despite possessing allegedly similar poor work habits.  *See id.* at 102:16–

104:6 (Sanderson detailing Doggett's failings and reporting that he "never really got" his job before

being fired).  A jury could reasonably see this pattern as supporting Sanderson's proposed

explanation for the differential treatment—that Leg Apparel harbored bias against Black employees.

Additionally, Sanderson's evidence of purportedly discriminatory comments, while

insufficient to prove a hostile work environment under federal or state law, meets the threshold to

sustain an analogous claim under the NYCHRL.[13]  As discussed, New York courts interpreting the

NYCHRL, in light of that statute's "broad[ ] remedial purpose," have specifically eschewed the

"severe or pervasive" standard applicable to Section 1981, Title VII, and NYSHRL hostile work

environment claims.  *Williams*, 872 N.Y.S.2d at 38.  Instead, if there "exist triable issues of fact" as to

whether comments or other purportedly discriminatory incidents in the workplace represent an

employee being treated "less well" than others based on a protected characteristic, the claim is for a

jury—not a court—to decide.  *Id.* at 39.

The Court questions whether several of Sanderson's allegations are actionable even under

this remarkably liberal standard.  Opinions about political and social events of the day, or about

celebrities—even if they *involve* race or another protected characteristic—are not necessarily

discriminatory.  *See* 56.1 ¶¶ 15–16, 50 (comments about Nikki Minaj, Taylor Swift, and Don

Lemon); Sanderson Dep. at 128:21–129:17 (comments about racial justice protests in Baltimore and

---

[13] As this Court has previously noted, given the NYCHRL's plaintiff-friendly standards, the term "hostile work environment" may not be the correct one to describe claims under that statute based on discriminatory comments in the workplace.  *See Syeed v. Bloomberg, L.P.*, 568 F. Supp. 3d 314, 341 n.12 (S.D.N.Y. 2021).  In any event, the Court continues to recognize that a "'less nice work environment claim' is not quite as gripping of a title," and so uses the term "hostile work environment" in this section even as it is "a bit of a misnomer when applied to a claim under the NYCHRL."  *Id.*

Rachel Dolezal).  Confronted with such a comment, one might try to shake it off, rather than pound

the alarm through litigation—just as Mr. Sanderson did at first.  But the Court need not reach this

issue because Romanino's "boyfriend" comments are a closer call.  *See* Sanderson Dep. at 128:21–

129:17.  A jury could, to be sure, reasonably view those comments also as "petty slights and trivial

inconveniences" that are not actionable even under the NYCHRL.  *Williams*, 872 N.Y.S.2d at 41.

But that is a decision for a jury to make:  New York courts, in applying the NYCHRL, have stated

that in "borderline situations," "a jury made up of a cross-section of our heterogeneous

communities"—not a court—should resolve whether allegations represent such petty slights or

trivial inconveniences or, alternatively, constitute actionable harassment.  *Id.* (quoting *Gallagher*, 139

F.3d at 342).  As a result, and given Sanderson's other allegations concerning his differential

treatment compared to Ford, summary judgment will be denied as to his NYCHRL discrimination

claim.

### B.  Retaliation Claims

Sanderson has alleged that Defendants retaliated against him in violation of Section 1981,

Title VII, the NYSHRL, and the NYCHRL.  *See* TAC ¶¶ 91–94, 102–105, 113–116, 129–132.

Because Sanderson has supplied sufficient evidence to support a jury finding that Defendants'

explanations for his termination may have been pretext for retaliation against Sanderson after he

complained about discrimination based on his perceived sexual orientation, summary judgment will

be denied as to Sanderson's Title VII, NYSHRL, and NYCHRL retaliation claims, but will be

granted as to his Section 1981 retaliation claim.

#### 1.  Legal Standard

Section 1981, Title VII, the NYSHRL, and the NYCHRL each contain causes of action for

retaliation.  *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (holding that "42 U.S.C.

§ 1981 encompasses claims of retaliation"); 42 U.S.C. § 2000e-3(a) (Title VII's retaliation provision,

which makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]"); N.Y. Exec. Law § 296(1)(e) (the NYSHRL's retaliation provision, which prohibits retaliation "against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under [the NYSHRL]"); N.Y.C. Admin. Code § 8-107(7) (the NYCHRL's retaliation provision, which prohibits employers from "retaliating or discriminating in any manner against any person because such person has opposed any practice forbidden under [the NYCHRL]").

Retaliation claims under Section 1981, Title VII, and the NYSHRL proceed under the three-step *McDonnell Douglas* burden-shifting framework and are analyzed pursuant to the principles applicable to retaliation claims under Title VII. *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) ("Retaliation claims made under 42 U.S.C. § 1981, like those made under Title VII, are evaluated using a three-step burden-shifting analysis."); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008) ("We typically treat Title VII and NYHRL discrimination claims as analytically identical, applying the same standard of proof to both claims."). "First, the plaintiff must establish a prima facie case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Baines*, 593 F.3d at 164 (internal citation and quotation marks omitted). The plaintiff's burden in this regard is "*de minimis*," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If the plaintiff establishes a *prima facie* case, "the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the

employment action." *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013). If it can

do so, "the presumption of retaliation arising from the establishment of the prima facie case drops

from the picture," and the burden is passed back to the plaintiff to prove pretext. *Id.* At this stage,

as with discrimination claims, the plaintiff must provide "facts sufficient to warrant a reasonable jury

finding by a preponderance of the evidence that 'the legitimate reasons offered by the defendant[s]

were not [their] true reasons, but were a pretext for [retaliation].'" *Fleming*, 371 F. App'x at 117

(summary order) (quoting *Richardson*, 532 F.3d at 125 n.11).

　　　As the NYCHRL is a "one-way ratchet, by which interpretations of state and federal civil

rights statutes can serve only as a floor below which the City's Human Rights law cannot fall,"

*Mihalik*, 715 F.3d at 109, its retaliation standard is somewhat easier for a plaintiff to satisfy than the

standard under Section 1981, Title VII, and the NYSHRL. "[T]o make out an unlawful retaliation

claim under the NYCHRL, a plaintiff must show that (1) he or she engaged in a protected activity as

that term is defined under the NYCHRL, (2) his or her employer was aware that he or she

participated in such activity, (3) his or her employer engaged in conduct which was *reasonably likely to

deter a person from engaging in that protected activity*, and (4) there is a causal connection between the

protected activity and the alleged retaliatory conduct." *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148

N.Y.S. 3d 238, 246 (2d Dep't 2021) (emphasis added). "New York courts have broadly interpreted

the NYCHRL's retaliation provisions." *Taylor v. City of New York*, 207 F. Supp. 3d 293, 308

(S.D.N.Y. 2016) (quoting *Mihalik*, 715 F.3d at 112); *see also Mestecky v. N.Y.C. Dep't of Educ.*, 791 F.

App'x 236, 239 (2d Cir. 2019) (summary order) ("[The] NYCHRL's retaliation provision is broader

than Title VII's." (citing *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 (2d Cir. 2015))).

　　　As under Section 1981, Title VII, and the NYSHRL, if the plaintiff can establish his *prima

facie* case under the NYCHRL, the Court proceeds by analyzing whether the defendants have

articulated a legitimate, non-discriminatory for the allegedly retaliatory action and then, if so, by

31

passing the burden back to the plaintiff to provide evidence showing that the employer's stated

reasons are pretextual.  *See Wilkerson v. Metro. Transp. Auth.*, No. 19-cv-9340, 2021 WL 5761649, at *9

(S.D.N.Y. Dec. 3, 2021).  For retaliation claims under the NYCHRL, as is the case for

discrimination claims under the statute, "summary judgment is appropriate" for the employer only

"if 'the record establishes as a matter of law' that . . . retaliation 'play[ed] no role' in the defendant's

actions.'"  *Ya-Chen*, 805 F.3d at 76 (quoting *Mihalik*, 715 F.3d at 110 n.8).

    2.  <u>Analysis</u>

    Summary judgment will be denied as to Sanderson's Title VII, NYSHRL, and NYCHRL

retaliation claims based on his perceived sexual orientation because Sanderson has both satisfied his

*prima face* case under those statutes and presented sufficient evidence for a reasonable jury to find

that Defendants' proffered reason for his discharge was pretextual.

    As an initial matter, while Sanderson's complaint alleges retaliation for protected conduct

based on both his race and perceived sexual orientation, Sanderson clarified during discovery that

his retaliation claims are based solely on his perceived sexual orientation.  *See* Sanderson Dep. at

169:23–170:14 ("Q:  And the letter you sent, you opposed discrimination based on what category,

what characteristic? A:  Sex.  Q:  So, are you making a claim for retaliation based on your race?  A:

No.  As I stated previously before on many occasions to you and in many documents, I never

claimed that I was terminated because of my race."); *see also* Sanderson Email at 1–2 (the email that

precipitated the events that led to his termination, which mentioned only Romanino's "boyfriend"

comments rather than any alleged racial discrimination).  So summary judgment will be granted as to

Sanderson's second count, retaliation based on Section 1981, as that statute protects only from race-

based discrimination and retaliation.  *See* 42 U.S.C. § 1981; *Vill. of Freeport v. Barrella*, 814 F.3d 594,

604–05 (2d Cir. 2016).

    Sanderson, however, has provided sufficient evidence for his retaliation claims based on

perceived sexual orientation to survive summary judgment. First, he has satisfied his *prima facie* case under all three relevant statutes. *See Baines*, 593 F.3d at 164 (for a plaintiff to meet his *prima facie* burden under Title VII and the NYSHRL, he must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action"); *Bilitch*, 148 N.Y.S. 3d at 246 (noting that the *prima facie* requirements are more lenient under the NYCHRL). His September 11, 2017 email complaining about Romanino's "boyfriend" comments constitutes protected activity. *See* Sanderson Email; *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (noting that an employee's complaint qualifies as a protected activity "so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law" (quoting *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001)). There is no question that Defendants knew of the protected activity. *See, e.g.*, Aff. of Melissa Romanino ¶ 19 (Romanino noting that she shared Sanderson's complaint with other Defendants and was interviewed about it). He suffered an adverse employment action in the form of his termination. *See Vega*, 801 F.3d at 85. And the two days between his protected activity and his termination are sufficiently close in time to suggest a causal connection between the protected activity and the adverse employment action. *See* Aff. of Melissa Romanino ¶ 23 (Sanderson was terminated on September 13, 2017); *Zann Kwan*, 737 F.3d at 845 (finding that a three-week period from a protected activity to termination was, standing alone, sufficient to satisfy the fourth element of a plaintiff's *prima facie* retaliation claim).

Next, Defendants have satisfied their burden—at the second step of *McDonnell Douglas*—to "articulate some legitimate, non-retaliatory reason for the employment action." *Zann Kwan*, 737 F.3d at 845. Specifically, Defendants allege that Sanderson was terminated not as retaliation for his complaint, but because he "was rude and disrespectful to his co-workers and violated [Leg

Apparel's] well-established workplace rules." Defs' Mem. at 13. There is evidence in the record sufficient to support this rationale for Sanderson's finding. *See, e.g.*, Aff. of Stuart Diamond ¶ 16 (attesting that Sanderson was fired because "there was overwhelming evidence that Sanderson violated [Leg Apparel's] rules and policies by speaking to his co-workers in a demeaning and disrespectful way"); *see also Reeves*, 530 U.S. at 142 (noting that the employer's burden at the second step of *McDonnell Douglas* is merely "one of production, not persuasion" that "involve[s] no credibility assessment" (internal citation omitted)). As a result, the burden is returned to Sanderson to "establish that the [Defendants'] reason is in fact pretext for unlawful discrimination." *Abrams*, 764 F.3d at 251.

Sanderson has presented just enough evidence "to warrant a reasonable jury finding by a preponderance of the evidence that 'the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext for [retaliation].'" *Fleming*, 371 F. App'x at 117 (quoting *Richardson*, 532 F.3d at 125 n.11). First, the extremely short, two-day timeframe between Sanderson's protected activity and his termination is probative evidence of pretext. *Zann Kwan*, 737 F.3d at 847 (noting that while "[t]emporal proximity *alone* is insufficient to defeat summary judgment at the pretext stage," a plaintiff "may rely on evidence comprising [his] prima facie case," including evidence of temporal proximity, "together with other evidence . . . to defeat summary judgment" (emphasis added)).

Second, Sanderson has pointed to an important weakness in Defendants' purported non-discriminatory reason for discharge. *See id.* ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating *weaknesses*, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." (emphasis added)). Specifically, it is undisputed that Borrelli deviated from Leg Apparel's typical practices when conducting the investigation that led to Sanderson's termination. In that

investigation, Sanderson himself was never interviewed about the allegations against him (as opposed to about the allegations he made).  *See* Aff. of Jennifer Borrelli ¶¶ 8–16.  In other words, Sanderson was never given an opportunity to deny or otherwise explain the conduct he was accused of, including inappropriate comments to other team members, that ultimately led to his termination. Significantly, this was a deviation from his employer's typical practice when a complaint is made, which is for management to "interview employee(s) named in [a] complaint" about that complaint. *Id.* ¶ 8.  A jury could find support for Plaintiff's claim in that unexplained deviation from Leg Apparel's practices—namely, that they did not want to provide him the opportunity to explain himself, because they were intent on his termination.

Finally, Romanino reports that she had previously complained to human resources about comments that Sanderson had made, but that no action was taken at that time.  *See* Aff. of Melissa Romanino ¶¶ 11–12, 15.  To be sure, Leg Apparel has offered an explanation as to why Sanderson was terminated in September 2017 but not before:  it says that it was only during the September 2017 investigation that the information about Sanderson's misbehavior reached upper management, who then made the decision to fire him.  Aff. of Stuart Diamond ¶ 16.  But it is for a jury to evaluate both the credibility of this explanation and the other factual disagreements presented by the parties. *Urbont v. Sony Music Ent.*, 831 F.3d 80, 88 (2d Cir. 2016) ("When deciding a summary judgment motion, a . . . court's function is not to weigh the evidence, make credibility determinations or resolve issues of fact, but rather to determine whether, drawing all reasonable inferences from the evidence presented in favor of the non-moving party, a fair-minded jury could find in the non-moving party's favor." (quoting *Beatie v. City of New York*, 123 F.3d 707, 710–11 (2d Cir. 1997)).  In sum, a jury could reasonably view (a) the extremely short temporal gap between Sanderson's protected activity and termination, together with (b) Leg Apparel's decision not to interview Sanderson about the allegations against him, and (c) the fact that Sanderson had not been fired or

disciplined for previous alleged problematic conduct, but was fired—after he complained about alleged discrimination—supposedly for similar conduct, as demonstrating that Leg Apparel's rationale for terminating Sanderson was pretext, and that retaliation was the actual "but-for cause of an adverse employment action." *Zann Kwan*, 737 F.3d at 847. Accordingly, Defendants' motion is denied as to Sanderson's retaliation claims based on his complaints about perceived sexual orientation.

### C. Individual Liability

Defendants' motion for summary judgment will be (a) denied with respect to Sanderson's claims seeking to impose individual liability against Defendants Spolansky and Diamond under the NYSHRL and NYCHRL, (b) denied as to Sanderson's claims seeking to impose individual liability against Romanino for aiding-and-abetting discriminatory conduct under the NYCHRL, but (c) granted as to Sanderson's claims seeking to impose similar liability against Romanino for aiding-or-abetting retaliation under the NYSHRL and the NYCHRL. TAC ¶¶ 117–121, 133–137.[14] As the Court explained in its memorandum resolving Defendants' motion to dismiss:

> "Unlike Title VII, the NYSHRL allows for individual liability. There are two available theories of liability: where the individual defendant is considered an employer, or where the defendant aided and abetted the unlawful discriminatory acts of others." *Xiang v. Eagle Enterprises, LLC*, No. 19 CIV. 1752 (PAE), 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020) (citing N.Y. Exec. Law § 296(1), *id.* § 296(6)). "An individual defendant is liable as an 'employer' under § 296(1) 'when that individual has an ownership interest in the relevant organization or the power to do

---

[14] Sanderson's complaint contains two "aiding and abetting" claims for alleged aiding and abetting of violations of the NYSHRL and the NYCHRL. TAC ¶¶ 117–121, 133–137. His pleadings and deposition clarify that, in bringing these claims, Sanderson is adopting the Court's individual liability reasoning outlined in the June 11, 2020 motion-to-dismiss order and opinion, which discussed not only aiding-and-abetting liability but also liability for individuals who can be considered 'employers' under relevant statutes. *See* Dkt. No. 79 at 19–21; *see also* Pl's Opp. at 23–24 ("Plaintiff's response to aiding and abetting claims[:] Plaintiff is indifferent as to whether an 'aiding and abetting' claim is viable against Romanino. *The Court has put forth that the 'Individual Liability Theory' is applicable.* The Court can decide this matter." (emphasis added)); Sanderson Dep. at 172:24–173:2 (Sanderson answering a question about his aiding and abetting claims: "As the Judge stated, [Spolansky] was in a position to hire and fire, and he allowed it to happen. *The Judge clearly made that position known in his Order and Opinion of June 11th.*" (emphasis added)). In light of the Court's duty to construe Sanderson's *pro se* complaint "liberally to raise the strongest arguments it suggests," the Court will consider—as it did at the motion to dismiss stage—whether Sanderson's arguments properly allege individual liability against Spolansky, Diamond, and Romanino under any applicable theory. *Nielsen*, 746 F.3d at 63.

more than carry out personnel decisions made by others,' i.e., the power to hire or fire." *Id.* (quoting *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012)).

Dkt. No. 79 at 19. And "[s]ince the NYSHRL uses virtually identical language to the applicable NYCHRL provision, claims under both statutes are subject to the same analysis." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429 450–51 (S.D.N.Y. 2018).

Both Spolansky and Diamond are subject to individual liability under the NYSHRL and the NYCHRL as employers, as they both had "the power to hire [and] fire." *Xiang*, 2020 WL 248941, at *5. Indeed, Diamond exercised that very power in this case, as he was the one who terminated Sanderson. Aff. of Stuart Diamond ¶ 18. And Defendants do not contest that, as CEO, Spolansky had the power to hire and fire. *See* Defs' Mem. at 23–24 (Defendants' arguments on the individual liability issue, which does not contest Spolansky's title or responsibilities). Accordingly, Sanderson may continue to pursue individual liability against Spolansky and Diamond in connection with all of the NYSHRL and NYCHRL claims that have not been dismissed in this order.

For her part, Romanino is subject to individual liability for Sanderson's surviving NYCHRL discrimination claim, but not for any of his retaliation claims. Romanino has attested—and there is no contrary evidence in the record—that she "did not have the authority to hire, discipline, or fire employees." Aff. of Melissa Romanino ¶ 10. So she cannot be held individually liable as an employer.

However, the aiding-and-abetting provisions in the NYSHRL and the NYCHRL "allow a co-worker who actually participates in the conduct giving rise to a discrimination [or retaliation] claim to be held liable under the NYSHRL [or the NYCHRL] even though that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold*, 366 F.3d at 158. Here, Romanino "participate[d] in the conduct giving rise to [Sanderson's] discrimination claim[s]," as it was her "boyfriend" comments that partially undergirded Sanderson's lone

surviving discrimination claim under the NYCHRL.  *See supra* Part III(A)(2)(ii).  She

therefore may be held liable for aiding-and-abetting that discrimination, even though her

actions served as part of "the predicate for the employer's vicarious liability" with respect to

that claim.  *Xiang*, 2020 WL 248941, at *5 (quoting *Conklin v. Cnty. of Suffolk*, 859 F. Supp. 2d

415, 436 (E.D.N.Y. 2012)).

Romanino cannot be held individually liable, however, for aiding-and-abetting any

retaliation against Sanderson.  That is because the unlawful act that supports those claims

was the allegedly retaliatory decision to terminate Sanderson after he complained about

discrimination based on his perceived sexual orientation.  *See supra* Part III(B)(2).  But there

is uncontested evidence in the record not only that Romanino did not participate in the

decision to fire Sanderson, but also that she actively sought *not* to discipline him.  *See* Aff. of

Melissa Romanino ¶ 23 ("Management did not consult with me regarding the decision to

terminate Sanderson's employment."); Aff. of Stuart Diamond ¶ 14 ("We were aware that

Romanino . . . had requested that [Leg Apparel] not discipline [Sanderson]. . . .  While

Romanino, as [Sanderson's] direct team leader may choose to tolerate [Sanderson's alleged

behavior], [Leg Apparel] could not ignore [it].").  As a result, Romanino did not aid-or-abet

any allegedly retaliatory conduct, and therefore summary judgment will be granted as to that

aspect of Sanderson's individual liability claims.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED IN

PART.  The motion is denied as to Sanderson's discrimination claim under the NYCHRL.  The

motion is also denied as to Sanderson's retaliation claims under Title VII, the NYSHRL, and the

NYCHRL, insofar as those claims are based on retaliation for his complaints about discrimination

based on his perceived sexual orientation.  Finally, the motion is denied in full as to Sanderson's

individual liability claims against Spolansky and Diamond under the NYSHLR and the NYCHRL, and is denied as to Sanderson's individual liability claim against Romanino for aiding-and-abetting discrimination under the NYCHRL.  The motion is granted as to all other aspects of Sanderson's claims.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 170.

SO ORDERED.

Dated:  March 31, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge